United States District Court
Southern District of Texas

**ENTERED**

August 31, 2018

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WESTPORT INSURANCE CORPORATION, on its own behalf and as assignee of HOUSTOUN, WOODWARD, EASON, GENTLE, TOMFORDE AND ANDERSON, INC., d/b/a INSURANCE ALLIANCE, | § § § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-16-1947 |
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY d/b/a PENN NATIONAL INSURANCE, | § § § § | |
| Defendant. | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Pending before the court[1] are Plaintiff Westport Insurance Corporation's ("Westport") Motion for Partial Summary Judgment (<u>Stowers</u>[2] Demands) ("<u>Stowers</u> Motion") (Doc. 103), Westport's Motion for Partial Summary Judgment (Breach of Contract) ("Breach Motion") (Doc. 104), and Defendant Pennsylvania National Mutual Casualty Insurance Company's ("Penn National") Motion for Partial Summary Judgment on Westport's Causes of Action for Breach of Contract and Promissory Estoppel (Doc. 106). The court has considered the

---

[1]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. <u>See</u> Doc. 40, Ord. Dated July 21, 2016.

[2]    The <u>Stowers</u> duty was first enunciated in <u>G.A. Stowers Furniture Co. v. Am. Indem. Co.</u> [hereinafter <u>Stowers</u>], 15 S.W.2d 544 (Tex. 1929). Pursuant to the <u>Stowers</u> duty, an insurance company can be held liable, under certain circumstances, for negligently failing to settle claims against its insured within the insurance policy limits. <u>See</u> <u>id.</u> at 547.

motions, all briefing and summary judgment evidence, and the applicable law.  For the reasons set forth below, the court **RECOMMENDS** that Westport's <u>Stowers</u> motion be **GRANTED IN PART AND DENIED IN PART**, Westport's Breach motion be **GRANTED IN PART AND DENIED**, and Penn National's motion be **GRANTED**.

## I.  Case Background[3]

Westport,[4] on its own behalf and as assignee of its insured Insurance Alliance[5] ("IA"), an insurance agency, filed this insurance action against IA's umbrella insurer to recover insurance proceeds Westport paid in excess of its policy limits.[6]

## A.  <u>The Insurance Policies</u>

IA purchased a primary Insurance Industry Professional Liability Policy from Westport ("Westport Policy").[7] The Westport Policy was a claims-made policy with a coverage period of June 1,

---

[3]     The parties submitted voluminous exhibits in support of their dispositive motions, some of which are duplicative.  The court has made no attempt to cite to the same record location each time a particular document is mentioned, to cite the first filed, or to focus on either the movant's or nonmovant's evidence.

[4]     Westport is also referred to as SwissRe in various parts of the record.  Herein, "Westport" refers to either or both.

[5]     Marsh & McLennan Companies Inc. ("Marsh") purchased Insurance Alliance in 2009.  <u>See</u> Doc. 106-8, Ex. 8 to Penn National's Mot. for Partial Summ. J. on Westport's Causes of Action for Breach of Contract & Promissory Estoppel ("Penn National's Mot."), Letter from Bart Wulff to James R. Redeker Dated Feb. 10, 2012.  Herein, "IA" refers to either or both.

[6]     <u>See</u> Doc. 1, Pl.'s Compl.; Doc. 22, Jt. Disc./Case Mgmt. Plan p. 2.

[7]     <u>See</u> Doc. 103-3, Ex. A to Westport's Mot. for Partial Summ. J. (<u>Stowers</u> Demands) ("<u>Stowers</u> Mot."), Westport Pol'y pp. WIC000004, WIC00015.

2

2007, to June 1, 2008.[8]  The limit of liability per claim was $5,000,000, equaled by the aggregate limit per policy period.[9]

The Westport Policy provided operations coverage that stated Westport was to "pay on behalf of the insured 'loss' for which the insured [was] legally liable caused by a 'wrongful act' committed by an insured arising out of 'professional services' rendered to others."[10]  Upon paying any "loss" or "claim expense," Westport became subrogated to IA's rights against others pursuant to the policy terms.[11]  The Westport Policy defined "claim expenses" to include "appeal bonds, limited to that portion of a bond which [did] not exceed the 'policy' Limit of Liability."[12]  Westport agreed to obtain the bond on behalf of the insured on the condition that the insured reimburse the additional cost of the bond for exposure in excess of the policy limits.[13]

Penn National issued IA an Agent's Umbrella Liability Policy ("Penn National Policy") that provided excess coverage for various underlying insurance policies including the Westport Policy.[14]  The

---

[8]     See id. p. WIC000004.

[9]     See id.

[10]    Id. p. WIC000015.

[11]    Id. p. WIC000010.

[12]    Id. p. WIC000008.

[13]    Id.

[14]    See Doc. 103-3, Ex. B to Westport's Stowers Mot., Penn National Pol'y pp. PENN-000003 to PENN-000005.

3

Penn National Policy provided coverage for the period June 1, 2007, to June 1, 2008, and carried a $15,000,000 limit per occurrence with an aggregate limit per policy period of the same amount.[15]

Coverage for professional services followed "the provisions, exclusions and limitations" of the Westport Policy and fell within the insuring agreement for bodily injury or property damage, which stated that Penn National was to "pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage' to which this insurance applies."[16]  The Penn National Policy imposed "the right and duty to defend the insured against any 'suit' seeking those damages when the 'underlying insurance' [did] not provide coverage or the limits of the 'underlying insurance' ha[d] been exhausted."[17]

Coverage liability did not apply unless the "Loss Payable" condition was met.[18]  The "Loss Payable" condition required that the "insured's 'underlying insurer' ha[d] become obligated to pay the 'retained limit'" and that the obligation "to pay part of the 'ultimate net loss' [had] been previously determined by a final settlement or judgment after an actual trial or written agreement

---

[15]   See id. p. PENN-000003.

[16]   Id. p. PENN-000026; see also id. p. PENN-000030 (excepting underlying insurance coverage from professional-services exclusion to insuring agreement).

[17]   Id. pp. PENN-000026, PENN-000030.

[18]   See id. p. PENN-000041.

4

between the insured, claimant, and us."[19]  The "Transfer of Defense"
condition stated that "[w]hen the underlying limits of insurance
have been used up in the payment of judgments or settlements, the
duty to defend will be transferred to us."[20]  Penn National
committed to cooperate in the transfer of control over any
outstanding claims that "would have been covered by the 'underlying
insurance' had the applicable limit not been used up."[21]

"Ultimate net loss" was defined as the total sum, after
reduction for recoveries or salvages collectible, that the insured
becomes legally obligated to pay by reason of settlement or
judgments or any arbitration or other alternate dispute method
[sic] entered into with our consent or the 'underlying insurer's'
consent."[22]  "Retained limit" was defined as "the available limits
of 'underlying insurance' scheduled in the declarations or the
'insured's retained limit,' whichever applies."[23]

**B.   <u>The Underlying Litigation</u>**

The underlying litigation implicated IA's professional
liability coverage under the Westport and Penn National policies.
The court recounts, in painful detail, the loss that gave rise to

---

[19]   <u>Id.</u>

[20]   <u>Id.</u>

[21]   <u>Id.</u>

[22]   <u>Id.</u> p. PENN-000045.

[23]   <u>Id.</u> p. PENN-000045.

IA's claim, the course of litigation, the communications among IA, Westport, Penn National, the underlying plaintiff, and others, and their actions.[24]

### 1.  Pre-Lawsuit

In 2005, Lake Texoma Highport LLC ("Highport") contracted with IA to act as Highport's agent in procuring property insurance coverage for its marina.[25]  For the renewal period beginning in March 2007, Highport sought changes in its then-current policy coverage, including $4 million in coverage for business interruption and the elimination of the coinsurance clause.[26]

According to the underlying amended pleading, IA "entered into secret agreements with other insurance agents and brokers," including CRC Insurance Services, Inc., ("CRC") and Bowood Partners Limited ("Bowood") with the goal of generating higher commissions while suppressing insurance proceeds paid on claims.[27]  Ultimately, IA, through CRC and Bowood, procured from Certain Underwriters at Lloyd's London ("Lloyd's") "the exact poorly worded, imprecise, and untailored marina property policy for Highport in 2007 that it

---

[24]   Much of the communication among the parties was through counsel. Rather than indicating in every instance whether an attorney or another party representative made the cited statement or took the action, the court attributes most actions and statements to the parties themselves.

[25]   See Doc. 103-4, Ex. H to Westport's _Stowers_ Mot., Highport's 4th Am. Pet. pp. 3-4.

[26]   See _id._ pp. 5-6.

[27]   _Id._ p. 6; _see also_ _id._ p. 7.

6

advised against in its analysis and risk assessment of Highport's prior insurance policies and coverage needs."[28]   According to Westport, IA did not review the policy, assuming the coverage was the same as that procured for the prior year.[29]   The policy covered the period March 31, 2007, to March 31, 2008.[30]

Within two months of the start of the coverage period, Highport suffered a significant, weather-related property loss.[31] Heavy rainfall caused water levels at Highport's marina to rise to the extent that "more than one of [Highport's] buildings were completely submerged under water and much of Plaintiff's property was completely destroyed."[32]   Highport made a claim with Lloyd's, which, in response, initially paid $1.5 million.[33]   Adjusters hired

---

[28]    Id. p. 10; see also Doc. 103-6, Ex. N to Westport's Stowers Mot., Letter from Rick Oldenettel to James R. Redeker, et al., Dated May 15, 2009 pp. 2-4.

[29]    Doc. 106-5, Ex. 5 to Penn National's Mot., Large Loss Report.

[30]    See Doc. 103-4, Ex. H to Westport's Stowers Mot., Highport's 4th Am. Pet. pp. 5, 10.

[31]    See id. p. 10; Doc. 103-6, Ex. N to Westport's Stowers Mot., Letter from Rick Oldenettel to James R. Redeker, et al., Dated May 15, 2009 p. 2; Doc. 106-5, Ex. 5 to Penn National's Mot., Large Loss Report.

[32]    Doc. 103-4, Ex. H to Westport's Stowers Mot., Highport's 4th Am. Pet. p. 10.

[33]    See Doc. 104-4, Ex. H to Westport's Mot. for Partial Summ. J (Breach of Contract) ("Breach Mot."), Oral Dep. of James R. Redeker Dated Oct. 18, 2017 p. 63; Doc. 106-5, Ex. 5 to Penn National's Mot., Large Loss Report.
    The court notes that the record contains two versions of the transcript of the deposition of James R. Redeker, one labeled video deposition and one labeled oral deposition.   The pagination of the transcripts do not align.   Thus, the court has endeavored to cite only the oral transcript.

by Highport estimated the damage at $8,391,598.48.[34]   Highport
submitted an insurance claim for $100,000 less than that amount.[35]

On January 7, 2008, three months prior to the filing of the
underlying lawsuit, IA provided Westport notice of Highport's
potential claim against IA for failing to procure the requested
insurance coverage.[36]   At that time, Westport opened a potential-
claim file.[37]

On January 13, 2008, Rock Houstoun ("Houstoun"), IA's chief
executive officer ("CEO"), emailed Rick Oldenettel ("Oldenettel"),
who was ultimately retained to represent IA in the Highport
action.[38]  Houstoun recounted a meeting he had with a representative
of Highport regarding its insurance coverage for the property
loss.[39]  The email stated that Highport assessed its best legal case
to be against "the claim adjuster/underwriter and [IA]."[40]  Houstoun

---

[34]    See Doc. 103-4, Ex. H to Westport's Stowers Mot., Highport's 4th Am.
Pet. p. 10.

[35]    See Doc. 103-6, Ex. N to Westport's Stowers Mot., Letter from Rick
Oldenettel to James R. Redeker, et al., Dated May 15, 2009 p. 5.

[36]    See Doc. 104-4, Ex. F to Westport's Breach Mot., Letter from Boyd
Wright to Jim Berger Dated Mar. 15, 2010; Doc. 104-4, Ex. H to Westport's Breach
Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 pp. 8, 13, 25.

[37]    See Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James
R. Redeker Dated Oct. 18, 2017 pp. 8-9.

[38]    See Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James
R. Redeker Dated Oct. 18, 2017 pp. 13, 23-24, 29; Doc. 112-8, Ex. 8A to Penn
National's Resp. to Westport's Stowers Mot., Email from Rock Houstoun to Rick
Oldenettel, et al., Dated Jan. 13, 2008.

[39]    See Doc. 112-8, Ex. 8A to Penn National's Resp. to Westport's Stowers
Mot., Email from Rock Houstoun to Rick Oldenettel, et al., Dated Jan. 13, 2008.

[40]    Id. p. 1.

also shared his own assessment of Highport's claim:

> As many things happen in the insurance business[,] all of
> this was completed over the phone at the last minute
> before renewal.  We were provided with renewal policies
> which were only partially complete as to applicable
> forms, but upon initial review everything appeared to be
> in order.  This claim happened a few months later and the
> coverage when full[y] analyzed is woefully short of the
> promised coverage.
>
> I explained that, although the adjuster hired by
> [Lloyd's] to adjust the claim has been far from
> cooperative and less than professional in my experience,
> they are not the big problem.  Ultimately[,] they have to
> settle the claim according to the policy terms and the
> only modification in terms can come through [Lloyd's].
> IA . . . has tried to rectify the situation through
> conversations with [Lloyd's] based on what IA and CRC
> agree were the correct and intended policy terms, but
> [Lloyd's] has remained firm that the policy terms as
> issued shall remain the basis for settlement at this
> time. [(]Not discussed with [the Highport representative]
> is the fact that I think we may be talking about a
> difference in coverage of between $5 and $10 million
> between what is going to be covered by the policy
> compared to what should be covered.  The policy as
> written does have a valuation provision (a form of
> coinsurance, so the policy is not Agreed Amount) and is
> not written on a blanket basis.  For instance, as
> written[,] our $4 million of business interruption limits
> is going to pay almost nothing; written on a blanket
> agreed amount basis it would most likely be a total
> loss)].[41]

## 2.  Pre-Trial

On April 7, 2008, Highport filed suit against IA and Lloyd's

in the 397th Judicial District Court of Grayson County, Texas.[42]

---

[41]   Id. pp. 1-2.

[42]   See Doc. 68-3, Ex. C to Westport's Am. Compl., Final J. p. 2; 103-6,
Ex. N to Westport's Stowers Mot., Letter from Rick Oldenettel to James R.
Redeker, et al., Dated May 15, 2009 p. 7; Doc. 106-5, Ex. 5 to Penn National's
Mot., Large Loss Report; Insurance Alliance v. Lake Texoma Highport, LLC, 452
S.W.3d 57, 63 (Tex. App.—Dallas 2014, pet. denied).

Highport raised numerous causes of action against IA, which, by the filing of the fourth amended pleading in 2011, included breach of contract, breach of warranty, breach of fiduciary duties, negligence, fraud, and violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act related to the alleged failure to procure the coverage sought by Highport.[43]  IA impleaded CRC and Bowood as third-party defendants.[44]

After the filing of the lawsuit, Westport sent a letter dated April 16, 2008, to IA in which Westport acknowledged notice of the Highport lawsuit and agreed to assume IA's defense pursuant to a full reservation of rights.[45]  The letter also stated, "As you are aware, [Highport's] counsel believes this case to be worth well in excess of your $5,000,000 in coverage with us."[46]  Westport advised IA that it should "immediately notify any excess carrier with whom you have a policy of insurance covering this event."[47]

Westport then retained Oldenettel as IA's defense attorney

---

[43]    See Doc. 103-4, Ex. H to Westport's Stowers Mot., Highport's 4th Am. Pet. pp. 21-49.

[44]    See Doc. 103-5, Ex. L to Westport's Stowers Mot., 3d-Party Compl.; Doc. 103-6, Ex. N to Westport's Stowers Mot., Letter from Rick Oldenettel to James R. Redeker, et al., Dated May 15, 2009 pp. 11-12; Doc. 106-5, Ex. 5 to Penn National's Mot., Large Loss Report.

[45]    See Doc. 103-5, Ex. J to Westport's Stowers Mot., Letter from James R. Redeker to Jim Berger Dated Apr. 16, 2008.

[46]    Id.; see also Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 p. 30 ("[W]e knew that there were claims in damages that exceeded the $5 million policy.").

[47]    Doc. 103-5, Ex. J to Westport's Stowers Mot., Letter from James R. Redeker to IA Dated Apr. 16, 2008.

10

while continuing to control IA's defense.[48]  On May 15, 2009, five days prior to a scheduled mediation and slightly more than one year after the filing of the Highport lawsuit, Oldenettel drafted a letter to Westport and IA stating that, although an initial exchange of documents by some of the parties had occurred, Oldenettel's opinion was that the mediation was "extremely premature" because no discovery had taken place.[49]  He further stated that mediation would "help frame the issues and enlighten the parties on the respective positions."[50]

In the fourteen-page letter, Oldenettel provided a two-page overview of the action and noted in the letter that CRC had served 3,587 documents on May 8, 2009, and Highport had delivered approximately 900 documents related to adjusters' estimates of damage.[51]  Oldenettel committed to analyzing all of those documents before mediation.[52]  Oldenettel was aware of Lloyd's payments on the insurance claim in the amount of $1,533,813 and of Highport's repair amounts as of the date of the letter in the total amount of $3,668,409.82.[53]  The letter also stated that Highport's retained

---

[48]    Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 pp. 13, 23-24, 29.

[49]    Doc. 103-6, Ex. N to Westport's <u>Stowers</u> Mot., Letter from Rick Oldenettel to James R. Redeker, et al., Dated May 15, 2009 p. 1.

[50]    <u>Id.</u>

[51]    <u>See id.</u> pp. 2-5.

[52]    <u>See id.</u> p. 5.

[53]    <u>See id.</u>

adjusters estimated the damage at $8,291.598.48 while Lloyd's adjusters estimated the damage at 3,158,976.65.[54]   At the time, Highport's business interruption claim was in the amount of $1,088,118.[55]

Oldenettel explained that Highport's allegations against IA depended on Lloyd's coverage position that policy coverage was consistent with information submitted by IA.[56]   He also explained IA's claims against CRC and Bowood, as well as their responsive positions.[57]   The letter concluded with the following position statement for mediation: "We will support Plaintiff's claims of coverage under the policy in question.   At this time we do not have a feel for a recommended settlement amount, but would hope to see how the mediation develops and with [Westport's] input can develop a possible contribution strategy at that time."[58]

At the mediation, which Westport did not attend, IA's highest offer was $20,000 as part of a $220,000 collective offer with CRC and Bowood.[59]   Highport's demand was $8.1 million, and Lloyd's offer

---

[54]   See id.

[55]   See id.

[56]   Cf. id. pp. 7-9 (discussing the claims raised in the underlying lawsuit).

[57]   See id. pp. 11-13.

[58]   See id. p. 14.

[59]   See Doc. 103-7, Ex. O to Westport's Stowers Mot., Letter from Rick Oldenettel to James R. Redeker, et al., Dated May 21, 2009 p. 1; Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line; Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18,

was $3.5 million.[60]  At 10:45 p.m., while the parties continued to mediate, Highport delivered an offer to IA for $2,000,000 with Highport's "full & complete release of any and all claims arising out of the placement of coverage at issue in the pending suit."[61] The offer was to remain open until 11:30 p.m. and was intended to comply with the Stowers doctrine.[62]  IA/Westport made no offer in response to the demand.[63]  At midnight, Lloyd's reached a settlement agreement with Highport for $5.25 million.[64]

The following day after the offer had expired, Oldenettel opined in a letter to Westport and IA: "Obviously, this Stower's [sic] letter is premature as there has not been an adequate opportunity to obtain discovery[65] and evaluate the merits of everyone's respective positions.  Furthermore, a 45-minute window

---

2017 p. 42.

[60]    See Doc. 103-7, Ex. O to Westport's Stowers Mot., Letter from Rick Oldenettel to James R. Redeker, et al., Dated May 21, 2009 p. 1.

[61]    Doc. 103-7, Ex. O to Westport's Stowers Mot., Offer to IA; see also Doc. 103-7, Ex. O to Westport's Stowers Mot., Letter from Rick Oldenettel to James R. Redeker, et al., Dated May 21, 2009; Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line.

[62]    See Doc. 103-7, Ex. O to Westport's Stowers Mot., Offer to IA.

[63]    See Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 p. 39.

[64]    See id. pp. 37-38; Doc. 106-5, Ex. 5 to Penn National's Mot., Large Loss Report, Highport Settlement Discussion Time Line.

[65]    James R. Redeker, Westport's assistant vice president, later testified that "very little discovery had taken place," that a discovery request was outstanding, and that Westport lacked information on Highport's damages. Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 pp. 33-35.

of opportunity on a Stower's [sic] letter is laughable."[66]   In Oldenettel's view, the "mediation was a complete waste of time" because he did not "learn any more about the respective positions and basis therefor."[67]

On June 29, 2009, Oldenettel provided Westport and IA with an "Attorney Suit Report" that detailed the factual and procedural background on the underlying suit, the chronology of key events and document references, the key factual and legal issues, the discovery plan, the expected outcome, and the case analysis.[68] Oldenettel stated that the case would be ripe for settlement in 2009 and listed problem areas related to the fact that Highport did not get the insurance that IA requested.[69]   He opined, "This is a case of liability - 100% as to failure to deliver the requested policy."[70]

In July 2009, the state court dismissed Highport's claims against Lloyd's due to settlement.[71]   In its later-filed Fourth Amended Petition, Highport cited as one reason for settlement with

---

[66]     Doc. 103-7, Ex. O to Westport's <u>Stowers</u> Mot., Letter from Rick Oldenettel to James R. Redeker, et al., Dated May 21, 2009 p. 1.

[67]     <u>Id.</u>

[68]     Doc. 109-3, Ex. A-11 to Westport's Resp. to Penn National's Mot., Attorney Suit Report.

[69]     <u>Id.</u>

[70]     <u>Id.</u> p. 14.

[71]     Doc. 68-3, Ex. C to Westport's Am. Compl., Final J. p. 1; Doc. 103-4, Ex. H to Westport's <u>Stowers</u> Mot., Highport's 4th Am. Pet. pp. 20-21.

Lloyd the need of an immediate influx of cash "to get the Marina back into operation in order to salvage [Highport's] business."[72]

In late July 2009, Westport increased the loss reserves for the Highport claim to $2 million based on a large loss report, which stated, "Due to the carrier settling out of the case and the discovery of some adverse information for our client, I am increasing loss reserves to $2MM.   This represents 50% of Highport's remaining unpaid damages."[73]

On August 21, 2009, Highport made an offer to enter a "high-low" arbitration to resolve all claims.[74]  The conditions included that the establishment of liability as to any of the defendants would result in a guaranteed recovery to Highport of at least $1.5 million and that the establishment of liability as to all of the defendants would result in a recovery of no more than $5 million.[75] All Highport defendants rejected the offer.[76]  Oldenettel viewed Highport's efforts as signaling that Highport was "losing interest

---

[72]    Doc. 103-4, Ex. H to Westport's <u>Stowers</u> Mot., Highport's 4th Am. Pet. pp. 20-21; <u>see also</u> Doc. 104-1, Westport's Mem. of Law in Support of its Breach Mot. p. 7.

[73]    Doc. 106-5, Ex. 5 to Penn National's Mot., Large Loss Report.

[74]    Doc. 109-3, Ex. A-16 to Westport's Resp. to Penn National's Mot., Letter from James D. Shields to Rick Oldenettel, et al., Dated Aug. 21, 2009; <u>see also</u> Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line.

[75]    <u>See</u> Doc. 109-3, Ex. A-16 to Westport's Resp. to Penn National's Mot., Letter from James D. Shields to Rick Oldenettel, et al., Dated Aug. 21, 2009.

[76]    <u>See</u> Doc. 109-3, Ex. A-17 to Westport's Resp. to Penn National's Mot., Letter from Rick Oldenettel to James R. Redeker, et al., Dated Aug. 26, 2009; Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line.

in a vigorous or expensive prosecution of this case and want[ed] to settle with as little time and effort as possible."[77]

On September 22, 2009, Highport sent IA a <u>Stowers</u> demand for settlement in the amount of $2.2 million in exchange for a release of any and all claims against IA related to the Highport litigation.[78]   The offer stated that it would remain open for fifteen days.[79]  Westport rejected the demand.[80]  Oldenettel noted that, by that point, Highport had recovered $6,783,813.48, had produced documents of expenditures in the amount of $3,735,505.24, and had not provided "reliable evidence that the terms of the policy as interpreted by the carrier ha[d] resulted in any damages."[81]

In January 2010, Oldenettel provided an updated "Attorney Suit Report."   A letter dated February 17, 2010, from Oldenettel to Westport stated that Highport's damage total as of the projected trial date was $7,452,459.34 after deducting Lloyd's payments and

---

[77]     Doc. 109-3, Ex. A-17 to Westport's Resp. to Penn National's Mot., Letter from Rick Oldenettel to James R. Redeker, et al., Dated Aug. 26, 2009.

[78]     <u>See</u> Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line & Letter from James D. Shields to Rick Oldenettel Dated Sept. 22, 2009 p. 1.

[79]     <u>See</u> Doc. 106-5, Ex. 5 to Penn National's Mot., Letter from James D. Shields to Rick Oldenettel Dated Sept. 22, 2009 p. 3.

[80]     Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 p. 145.

[81]     Doc. 109-3, Ex. A-18 to Westport's Resp. to Penn National's Mot., Letter from Rick Oldenettel to James R. Redeker Dated Sept. 23, 2009.

not including Highport's attorneys' fees.[82]   On February 18, 2010,
Penn National received email notice of IA's claim related to the
Highport lawsuit.[83]

According to James R. Redeker ("Redeker"), Westport's
assistant vice president, six claims had been made on the Westport
Policy for the 2007-2008 period, three of which were closed without
payment.[84]  On March 3, 2010, Westport issued a payment to Delta
Seaboard Well Services, Inc., ("Delta Seaboard") in the amount of
$686,826.89 on a insurance claim filed on August 3, 2007.[85]   On
March 9, 2010, Penn National inquired about the number of open
claims pending against IA at that time.[86]   Two open claims were
identified only by Westport's claim numbers and were listed as
reserved for $2,000,000 and $350,000.[87]  A year later, Westport paid
LJH, Ltd., $976,508.82 on the insurance claim filed on October 15,

---

[82]     Doc. 106-5, Ex. 5 to Penn National's Mot., Letter from Rick
Oldenettel to James R. Redeker Dated Feb. 17, 2010 p. 1, Damage Tables.

[83]     Doc. 104-4, Ex. F to Westport's Breach Mot., Boyd Wright to Jim
Berger Dated Mar. 15, 2010.

[84]     See Doc. 103-4, Ex. D to Westport's Stowers Mot., Letter from James
R. Redeker to Jim Berger Dated Nov. 9, 2011; Doc. 103-4, Ex. F to Westport's
Stowers Mot., Email from James R. Redeker to Boyd Wright Dated Mar. 15, 2010.

[85]     See Doc. 103-3, Ex. C to Westport's Stowers Mot., Westport's Resps.
& Objs. to Penn National's 1st Set of Interrogs. Resp. No. 13; Doc. 103-4, Ex.
D to Westport's Stowers Mot., Letter from James R. Redeker to Jim Berger Dated
Nov. 9, 2011; Doc. 117-4, Ex. 5 to Westport's Reply in Support of its Stowers
Mot., Gen. Liability Not. of Cl.

[86]     See Doc. 103-4, Ex. F to Westport's Stowers Mot., Email from Boyd
Wright to James R. Redeker Dated Mar. 9, 2010.

[87]     See id.

17

2007.[88]   At that point, the remaining aggregate limit on the Westport Policy was $3,336,664.29.[89]

In a letter to IA dated March 15, 2010, Penn National acknowledged first receipt of notice of the Highport lawsuit, notice which Penn National contended was late and in violation of IA's duties under the policy.[90]   Penn National also stated that it could not evaluate coverage at that time because it was not in possession of the pleadings or other materials bearing on the Highport case.[91]   The letter noted that it was not a denial of coverage but, rather, a notice of a potential coverage issue.[92] Penn National sent copies of the letter to IA's defense counsel, and Westport.[93]

Penn National also sent a letter of the same date to Westport "demanding [it] resolve this case within [its] limits

---

[88]     See Doc. 103-3, Ex. C to Westport's Stowers Mot., Westport's Resps. & Objs. to Penn National's 1st Set of Interrogs. Resp. No. 13; Doc. 103-4, Ex. D to Westport's Stowers Mot., Letter from James R. Redeker to Jim Berger Dated Nov. 9, 2011; Doc. 117-3, Ex. 4 to Westport's Reply in Support of its Stowers Mot., Gen. Liability Not. of Cl.

[89]     See Doc. 103-4, Ex. D to Westport's Stowers Mot., Letter from James R. Redeker to Jim Berger Dated Nov. 9, 2011.

[90]     Doc. 104-4, Ex. F to Westport's Breach Mot., Letter from Boyd Wright to Jim Berger Dated Mar. 15, 2010 pp. 1-2.

[91]     See id. p. 2; Doc. 103-4, Ex. G to Westport's Stowers Mot., Penn National's Claim Notes p. 119.

[92]     See Doc. 104-4, Ex. F to Westport's Breach Mot., Letter from Boyd Wright to Jim Berger Dated Mar. 15, 2010 p. 4.

[93]     See id.; Doc. 103-4, Ex. G to Westport's Stowers Mot., Penn National's Claim Notes p. 120.

immediately."[94]  Specifically, the letter stated:

> Counsel's report of January 12, 2010[,] suggests damages may exceed Westport's $5,000,000 limit of liability coverage for [IA].  Westport's reservation of rights letters of April 16, 2008[,] and April 14, 2009[,] also reference the potential for excess of exposure beyond Westport's limits.  Penn National believes other claims presented against [IA] and paid by Westport may have also compromised the per claim/aggregate limits available to [IA].
>
> . . . . Given the current damages potential, counsel's evaluation and Westport's excess of limits warning to [IA], Westport should take immediate action to negotiate settlement up to a tender of Westport's limits to settle this pending litigation.
>
> As you are aware, Westport has a reciprocal duty of good faith to Penn National . . . to take reasonable steps to effect settlement within Westport's policy limits.  Since Westport is presented with an opportunity to resolve this claim within Westport's policy limits, Penn National . . . considers any resulting . . . exposure to Penn National . . . will result in our looking to Westport to pay all such sums owed.[95]

A Penn National claim note from March 23, 2010, stated that IA's defense counsel invited Penn National to review the Highport case file at his office in Texas.[96]  Finding that impractical, Penn National requested the file to be sent, either in paper or electronic form.[97]  On March 31, 2010, a claim note indicated that

---

[94]     Doc. 103-4, Ex. G to Westport's Stowers Mot., Penn National's Claim Notes p. 120; see also Doc. 103-7, Ex. P to Westport's Stowers Mot., Letter from Boyd Wright to James R. Redeker Dated Mar. 15, 2010.

[95]     Doc. 103-7, Ex. P to Westport's Stowers Mot., Letter from Boyd Wright to James R. Redeker Dated Mar. 15, 2010.

[96]     See Doc. 103-4, Ex. G to Westport's Stowers Mot., Penn National's Claim Notes p. 120.

[97]     See id.

IA's defense counsel had implied that Penn National's attendance at mediation might be necessary.[98]  Penn National resisted committing to attendance, asserting that it was in no position to evaluate the claim as it lacked the defense counsel's evaluation and other materials that had been requested but not provided.[99]

Penn National's claim notes from April 2010 reflected a concern that "Westport, who ha[d] a demand within [its] policy limits from the last mediation [would] fail to work on resolving this case, despite counsel's inference that settlement should occur."[100]  Penn National enlisted outside counsel to review the file of IA's defense counsel in the Highport case and to "deal[] with Westport so it negotiates a reasonable settlement."[101]

On May 12, 2010, in advance of a second mediation, Highport drafted a letter to IA offering to release any and all of Highport's claims against IA in exchange for $4.9 million.[102]  The letter was self-identified as a _Stowers_ demand.[103]  Highport quoted

---

[98]    See _id._ p. 119.

[99]    See _id._

[100]    Doc. 103-4, Ex. G to Westport's _Stowers_ Mot., Penn National's Claim Notes p. 118.

[101]    _Id._

[102]    See Doc. 103-8, Ex. U to Westport's _Stowers_ Mot., Letter from James D. Shields to Rick Oldenettel, et al., Dated May 12, 2010 p. 1; Doc. 112-10, Ex. 8 to Penn National's Resp. to Westport's _Stowers_ Mot., Email from Robert C. McCabe to Rick Oldenettel Dated Jan. 23, 2012.

[103]    See Doc. 103-8, Ex. U to Westport's _Stowers_ Mot., Letter from James D. Shields to Rick Oldenettel, et al., Dated May 12, 2010 p. 1.

the testimony of IA's CEO Houstoun, in which he admitted that IA bore "some responsibility" for not procuring a 2007-2008 property insurance policy for Highport that complied with its requested coverage provisions.[104]  The mediation was held on May 18, 2010, at which time Highport demanded $5.9 million that was met with a final joint offer from IA, CRC, and Bowood of $2.1 million.[105]

Three days after the unsuccessful second mediation attempt, the mediator proposed an "overall resolution" of the Highport claims that he presented as having at least a fifty-percent probability of being acceptable to all of the parties.[106]  The mediator explained that his settlement proposal included a total amount with a confidential amount to be contributed by the defendant to whom it was addressed.[107]  The proposal was designed to succeed only if all parties accepted it.[108]  The mediator proposed that Highport release all claims against IA in exchange for the payment of $2.1 million of a $3.6 million overall settlement.[109]

---

[104]     Id.

[105]     See Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line (stating, though, that the joint offer was only $500,000); Doc. 112-10, Ex. 8 to Penn National's Resp. to Westport's Stowers Mot., Email from Robert C. McCabe to Rick Oldenettel Dated Jan. 23, 2012.

[106]     Doc. 103-8, Ex. V to Westport's Stowers Mot., Letter from W. Robins Brice to James D. Shields, et al., Dated May 21, 2010.

[107]     See id.

[108]     See id. p. 2.

[109]     See Doc. 103-8, Ex. V to Westport's Stowers Mot., Mediator's Proposed Settlement Agreement.

21

Although IA/Westport agreed to its proposed share, the proposal failed by its terms.[110]

In a letter dated May 24, 2010, Penn National sent a letter to Westport regarding the $4.9 million <u>Stowers</u> demand.[111]  The letter stated:

> The more interesting part of the <u>Stowers</u> demand from our perspective was [Highport's] disclosure [that it] made two prior offers to settle this matter well within the policy limits of the Westport[] policy . . . for $1 million and $2.5 million, respectively, which [Highport] says were rejected.  These offers were apparently made by [Highport] and rejected by Westport prior to the date on which [IA] first notified Penn National of this claim.  Unless you can direct us to some document or documents to the contrary, it appears [Highport] properly <u>Stowerized</u> Westport in its prior settlement demands.  Accordingly, whether the May 13,[112] 2010 letter constitutes a proper <u>Stowers</u> demand appears to irrelevant.

> We are also aware Westport's policy limits are impaired by virtue of payment of other claims and/or claim pending reserves.  Due to the earlier <u>Stowers</u> demands received by Westport in this matter and within Westport's limits, with the subsequent failure to settle this pending case based on those earlier demands, Westport has breached its duties to [IA] and Penn National under <u>Stowers</u>.  Thus Wes[t]port should also prepare to indemnify the other pending action, entitled <u>LJH Interests, et al. v. Rock N. Hou[s]toun and William Patrick Hou[s]toun, et al</u>[.] . .

---

[110]    <u>See</u> Doc. 103-8, Ex. W to Westport's <u>Stowers</u> Mot., Letter from Oldenettel to W. Robins Brice Dated June 1, 2010; Doc. 103-8, Ex. X to Westport's <u>Stowers</u> Mot., Letter from W. Robins Brice to James D. Shields, et al., Dated June 1, 2010; Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line; Doc. 112-10, Ex. 8 to Penn National's Resp. to Westport's <u>Stowers</u> Mot., Email from Robert C. McCabe to Rick Oldenettel Dated Jan. 23, 2012.

[111]    <u>See</u> Doc. 104-6, Ex. X to Westport's Breach Mot., Letter from Boyd Wright to James R. Redeker Dated May 24, 2010.

[112]    This date refers to the date on which Penn National received the <u>Stowers</u> demand.  <u>See</u> <u>id.</u> p. 1.  The letter to which Penn National referred was drafted on May 12, 2010.  <u>See</u> Doc. 103-8, Ex. U to Westport's <u>Stowers</u> Mot., Letter from James D. Shields to Rick Oldenettel, et al., Dated May 12, 2010.

. .

Accordingly, Penn National hereby demands Westport settle
these cases at its own expense.  In the Highport matter,
Westport should resolve this case either for the $4.9
million demanded in Highport's May 13, 2010 letter or in
any agreement for lesser amount that you may negotiate.
. . . If Penn National is ultimately required to
contribute towards a judgment entered against [IA] as the
result of Westport's negligence in failing to settle this
claim, or the LJH Interests case, earlier for an amount
within its remaining policy limits, Penn National shall
seek recovery from Westport of such amounts as an
equitable subrogee . . . .[113]

An email from IA's counsel dated June 2, 2010, and addressed

to representatives of IA and to Redecker stating, "Attached is the

letter from the mediator indicating that his proposal was rejected.

In that we know our co-defendants turned down the proposal, we do

not know whether [Highport] accepted it."[114]   The email further

stated:

The co-defendants would like to make a counter to
[Highport] of $1.8 million with [IA] funding $1.2 million
and the other defendants contributing $300,000 each.  We
are recommending that[,] if you are interested in making
a joint offer at this time, we go back to them saying
that we will contribute $1 million contingent upon
th[eir] each contributing $400,000.[115]

A couple of days later, IA started an email conversation with the

---

[113]     Doc. 104-6, Ex. X to Westport's Breach Mot., Letter from Boyd Wright
to James R. Redeker Dated May 24, 2010 pp. 1-2.

[114]     Doc. 109-4, Ex. A-26 to Westport's Resp. to Penn National's Mot.,
Email from Robert C. McCabe to James R. Redeker, et al., Dated June 2, 2010.

[115]     Id.

other Highport defendants that lasted more than two weeks.[116]  In the first communication, IA agreed to the combined $1.8 million offer but limited its contribution to $1 million, asking the other defendants to up their contributions by $100,000 each.[117]  An email from CRC recounted a conversation with the mediator who gave the impression that Highport would not settle for less than $3.6 million.[118]  Even so, the email's author stated his opinion that "making the counter is a good idea."[119]

On June 10, 2010, IA notified the others that the mediator had informed IA that Highport expressed a "renewed desire" to negotiate.[120]  On June 18, 2010, the other Highport defendants agreed to contribute $350,000 each with IA's contributing $1.1 million.[121]  On June 22, 2010, IA informed the others that it was willing to contribute $1 million if the others would contribute $700,000 together.[122]  As the negotiations on the amounts each party would contribute continued, CRC noted the lack of consensus on the $1.8 million total offer and recommended that they advise the

---

[116]   See Doc. 109-4, Ex. A-27 to Westport's Resp. to Penn National's Mot., Various June 2010 Email Communications.

[117]   See id.

[118]   See id.

[119]   Id.

[120]   Id.

[121]   See id.

[122]   See Doc. 109-4, Ex. A-29 to Westport's Resp. to Penn National's Mot., Various June 2010 Email Communications.

mediator the three were willing to "offer Highport the sum of $1.6 million for a global settlement, with no indication of how [the Highport defendants were] allocating the amount."[123]  At that point, Westport opined that the $1.1 million contribution by IA to the other defendants $700,000 contribution was "a better offer."[124]

On July 7, 2010, IA, CRC, and Bowood proposed a collective $1.8 million settlement to Highport with IA's contributing $1.1 million and CRC and Bowood's contributing a total of $700,000.[125] Consistent with the mediator's prior proposal, "The $1.8 million settlement offer was conveyed to [Highport] without identifying how much each Defendant contributed to the offer."[126]  On July 24, 2010, Highport proposed a counteroffer of $3.6 million, indicating that it was the least Highport would accept, and IA/Westport rejected it.[127]  The record reflects that the next settlement action was at the end of October 2010 when IA agreed to increase its offer to

---

[123]    Id.

[124]    Id.

[125]    See Doc. 103-8, Ex. Y to Westport's Stowers Mot., Email from Robert C. McCabe to James R. Redeker, et al., Dated July 12, 2010; Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line; Doc. 109-4, Ex. A-26 to Westport's Resp. to Penn National's Mot., Email from Robert C. McCabe to James R. Redecker, et al., Dated June 2, 2010; Doc. 109-4, Ex. A-27 to Westport's Resp. to Penn National's Mot., Various June 2010 Email Communications; Doc. 109-4, Ex. A-29 to Westport's Resp. to Penn National's Mot., Various June 2010 Email Communications.

[126]    Doc. 103-8, Ex. Y to Westport's Stowers Mot., Email from Robert C. McCabe to James R. Redeker, et al., Dated July 12, 2010.

[127]    See Doc. 103-8, Ex. Z to Westport's Stowers Mot., Email from Robert C. McCabe to James R. Redeker, et al., Dated July 24, 2010; Doc. 104-4, Ex. H to Westport's Breach Mot., Dep. of James R. Redeker Dated Oct. 18, 2017 p. 145; Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line.

$1.3 million and the other two Highport defendants agreed to increase their contributions to $400,000 each to reach a total combined offer of $2.1 million.[128]  "After much delay," Highport declined the offer, notifying IA that it was "sticking with [its] $3.6 million demand."[129]  IA expressed an unwillingness to increase its offer to $1.5 million as encouraged by Bowood, which also proposed that Bowood and CRC further increase their contributions to reach a total offer of $2.5 million.[130]  According to IA, Westport's position was always that the Highport action could be resolved for far less than the policy limits and that Westport was unwilling to tender its policy limits.[131]

In October 2011, Highport filed a Fourth Amended Petition that noted Lloyd's dismissal.[132]  Highport alleged that IA and the brokers committed professional negligence by failing to procure an insurance policy with the coverage Highport specifically requested.[133]  In November 2011, in advance of a court-ordered third

---

[128]     See Doc. 103-8, Ex. AA to Westport's Stowers Mot., Letter from Robert C. McCabe to James R. Redeker, et al., Dated Dec. 2, 2010; Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line.

[129]     See Doc. 103-8, Ex. AA to Westport's Stowers Mot., Letter from Robert C. McCabe to James R. Redeker, et al., Dated Dec. 2, 2010 p. 1.

[130]     See id.; Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line.

[131]     See Doc. 112-7, Ex. 7 to Penn National's Resp. to Westport's Stowers Mot., Dep. of Bart Wulff p. 31.

[132]     Doc. 103-4, Ex. H to Westport's Stowers Mot., Highport's 4th Am. Pet.

[133]     Doc. 22, Jt. Disc./Case Mgmt. Plan p. 3; see also Doc. 103-4, Ex. H to Westport's Stowers Mot., Highport's 4th Am. Pet.

mediation, Highport floated a demand of $25 million with IA's portion at $14,999,999.[134]  In response to Highport's demand to IA, Westport's Redeker characterized the demand as "ridiculous given the facts of this case."[135]  At the mediation on November 9, 2011, Highport started with the $25 million demand and lowered it to $23 million, which received no offers and effectively ended mediation.[136]  On January 23, 2012, IA and CRC made a joint offer of $1.7 million with IA providing $1.3 million.[137]  Highport advised that it would not be responding to that offer.[138]

In a letter dated February 10, 2012, Bart Wulff ("Wulff"), who was retained as IA's counsel in connection with the Highport action, introduced his role to assist IA in "attempting to bring [the Highport] claim to resolution."[139]  The letter reflected the understanding that Westport had not, at any time, indicated that

---

[134]    See Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line; Doc. 112-10, Ex. 8C to Penn National's Resp. to Westport's Stowers Mot., Email from Robert C. McCabe to Rick Oldenettel Dated Jan. 23, 2012.

[135]    Doc. 103-4, Ex. D to Westport's Stowers Mot., Letter from James R. Redeker to Jim Berger Dated Nov. 9, 2011.

[136]    See Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line; Doc. 112-10, Ex. 8C to Penn National's Resp. to Westport's Stowers Mot., Email from Robert C. McCabe to Rick Oldenettel Dated Jan. 23, 2012.

[137]    See Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line.

[138]    See Doc. 106-5, Ex. 5 to Penn National's Mot., Highport Settlement Discussion Time Line.

[139]    Doc. 106-8, Ex. 8 to Penn National's Mot., Letter from Bart Wulff to James R. Redeker Dated Feb. 10, 2012; see also Doc. 106-8, Ex. 8 to Penn National's Mot., Letter from Bart Wulff to Robert P. Conlon Dated July 24, 2012 p. 1.

the case "presented a danger of excess liability" and, even as recently as February 3, 2012, "continued to evaluate the case as one well within Westport's policy limits and . . . expected to be able to settle the case within policy limits."[140]

IA noted that Westport had passed on several opportunities to settle within limits based on its belief that a lower settlement could be reached, stating:

> That is obviously a tactic that Westport is free to utilize only if the gamble it is taking is being taken with its own money[,] and we believe that the effect of that course of conduct is to render Westport liable for any judgment which might be entered in the case even if it exceeds Westport's policy limits.  We are informed by the excess carrier's counsel that [Penn National] take[s] the same position and ha[s] previously informed you that that is [its] position.[141]

IA urged Westport to resolve the case as promptly as possible because "it seem[ed] to be clear that [IA was] exposed to a jury verdict and ultimately a judgment in a much larger amount."[142]

### 3.  Trial and Appeal

On April 17, 2012, the Highport trial began against IA and Bowood, and the jury ultimately found in favor of Highport.[143]  On June 20, 2012, the state trial court entered a final judgment

---

[140]    Doc. 106-8, Ex. 8 to Penn National's Mot., Letter from Bart Wulff to James R. Redeker Dated Feb. 10, 2012.

[141]    Id. pp. 1-2.

[142]    Id. p. 2.

[143]    See Doc. 22, Jt. Disc./Case Mgmt. Plan p. 3; Doc. 68-3, Ex. C to Westport's Am. Compl., Final J. pp. 1-2; Insurance Alliance v. Lake Texoma Highport, LLC, 452 S.W.3d 57, 64 (Tex. App.—Dallas 2014, pet. denied).

against IA and awarded damages in the amount of $8,738,598, representing the jury's determination of the amount of property and business-interruption coverage that would have been provided by the requested policy less the amount available under the policy obtained.[144]   The court also awarded interest, court costs, and attorneys' fees.[145]   The court rendered judgment that Highport and IA take nothing against Bowood.[146]   The court simultaneously severed all claims against CRC in favor of mandatory arbitration.[147]

In May and June 2012, IA wrote Westport to inquire about a possible appeal and about the arrangements being made to fulfill Westport's obligations to obtain a supersedeas bond pending appeal.[148]   In the May letter, IA stated:

> Because Mr. Redeker has rejected all settlement offers to date and has never tendered his policy limits, the decision whether to attempt to settle the case at this point, pay off the judgment as entered or appeal is in the first instance a decision to be made by Mr. Redeker on behalf of the primary carrier which still controls the

---

[144]   See Doc. 68-3, Ex. C to Westport's Am. Compl., Final J. pp. 2-3; Insurance Alliance v. Lake Texoma Highport, LLC, 452 S.W.3d 57, 64-65 (Tex. App.—Dallas 2014, pet. denied).

[145]   See Doc. 68-3, Ex. C to Westport's Am. Compl., Final J. pp. 2-3; Insurance Alliance v. Lake Texoma Highport, LLC, 452 S.W.3d 57, 65 (Tex. App.—Dallas 2014, pet. denied).

[146]   See Doc. 68-3, Ex. C to Westport's Am. Compl., Final J. p. 4; Insurance Alliance v. Lake Texoma Highport, LLC, 452 S.W.3d 57, 63, 65 (Tex. App.—Dallas 2014, pet. denied).

[147]   Doc. 68-3, Ex. C to Westport's Am. Compl., Final J. p. 1.

[148]   Doc. 109-4, Ex. A-33 to Westport's Resp. to Penn National's Mot., Letter from Bart Wulff to James R. Redeker Dated June 27, 2012.

defense.[149]

IA expressed its concern that a judgment in the case would "start the clock ticking on a deadline by which the judgment either need[ed] to be satisfied by payment or a supersedeas bond posted to suspend its enforcement pending appeal."[150]  IA requested, without expressing any opinion on how the obligation should be split between Westport and Penn National, that the two prepare "in an orderly fashion to deal with that situation and that no dispute between your two companies result[] in any adverse consequences to [IA].[151]

Westport decided to appeal and sent IA a letter regarding the supersedeas bond.[152]  Westport explained its position that, "[p]ursuant to the terms of the policy, Westport is only obligated to obtain a bond up to the amount of the remaining policy limits."[153]  Westport stated that it would obtain a bond in the amount of $3.3 million and asserted that IA or Penn National was responsible for obtaining a bond for the remaining amount of the

---

[149]    Doc. 109-7, Ex. B-3 to Westport's Resp. to Penn National's Mot., Letter from Bart Wulff to James R. Redeker Dated May 29, 2012.

[150]    Id.

[151]    Id.

[152]    See Doc. 109-8, Ex. B-27 to Westport's Resp. to Penn National's Mot., Letter from Robert P. Conlon to Jim Berger Dated July 20, 2012; Doc. 112-7, Ex. 7 to Penn National's Resp. to Westport's Stowers Mot., Dep. of Bart Wulff p. 18.

[153]    Doc. 109-8, Ex. B-27 to Westport's Resp. to Penn National's Mot., Letter from Robert P. Conlon to Jim Berger Dated July 20, 2012 p. 2.

judgment in order to stay execution.[154]

In a letter dated July 24, 2012, IA accused Westport of "either fail[ing] to understand or intentionally misrepresent[ing] what the policy actually provide[d]."[155]  The letter asserted that it was "crystal clear" that it was "Westport's obligation to procure a bond sufficient to supersede the entire judgment" and then to seek reimbursement for any premium "attributable to any portion of the judgment which exceed[ed] Westport's liability."[156] IA opined that it was "unlikely that anyone other than Westport ha[d] responsibility for payment of the judgment" due to Westport's repeated rejections of offers to settle within the Westport Policy limits.[157]

On July 30, 2012, Oldenettel notified IA and Westport that Highport had filed a petition for a writ of garnishment to seize bank assets of IA.[158]  He stated, "We need to get the supersedeas bond in place immediately. . . . Obviously, this is a most urgent situation."[159]  Oldenettel requested that Penn National "immediately advise if Penn National [was] willing to bond the remainder of the

---

[154]    See id.

[155]    Doc. 106-8, Ex. 8 to Penn National's Mot., Letter from Bart Wulff to Robert P. Conlon Dated July 24, 2012 p. 1.

[156]    Id.

[157]    Id.

[158]    See Doc. 109-4, Ex. A-35 to Westport's Resp. to Penn National's Mot., Email from Rick Oldenettel to James R. Redeker, et al., Dated July 30, 2012.

[159]    Id.

Judgment."[160]  On the same day, IA responded:

> As indicated in my letters to Westport's lawyers[,] . .
> . it appears to us that the policy is clear that it is
> Westport's obligation to timely procure a bond
> superseding 100% of the judgment. This[, it has] failed
> to do.  We need to know immediately whether [it is] now
> going to honor or continue to breach [its] contractual
> obligation.[161]

Westport responded to IA's email response, stating that its position was that it was only obligated to obtain a bond in the amount of its remaining policy limits.[162]  Westport indicated that it was preparing to post a bond for that amount.[163]  The letter further stated that it was willing to obtain a supersedeas bond for the amount of the judgment, paying the proportion of the bond premium that its remaining limits bore to the total if Penn National would pay the remainder and agree to indemnify Westport for the amount in excess of Westport's remaining limits in the event the bond was called up to pay out.[164]

In a letter to Westport dated July 31, 2012, Penn National responded to a letter from Westport regarding its position on the supersedeas bond and stated that Westport's letter misrepresented

---

[160]    Id.

[161]    Doc. 109-4, Ex. A-35 to Westport's Resp. to Penn National's Mot., Email from Bart Wulff to Rick Oldenettel, et al., Dated July 30, 2012.

[162]    See Doc. 109-7, Ex. B-5 to Westport's Resp. to Penn National's Mot., Letter from Douglas W. Walker to Boyd Wright Dated July 30, 2012 p. 1.

[163]    See id.

[164]    Id. pp. 1-2.

the terms of the Westport Policy.[165]  Penn National's letter echoed
IA's interpretation of Westport's duty to procure a bond for the
entire amount of the judgment and criticized Westport for delaying
more than a month until after Highport filed a writ of garnishment
against IA before "announcing that [Westport] did not intend to
honor the terms of its policy and protect its insured."[166]  The
letter continued:

> After Westport's lengthy delay, you have now provided
> less than a full day's notice that Westport intends to
> breach its duty to post a bond for the entire amount
> unless Penn National agrees to Westport's proposal that
> includes Penn National['s] funding an unspecified amount
> of the bond and agreeing to indemnify Westport for
> amounts in excess of Westport's policy limits.[167]

Penn National contended that Westport failed to provide
information necessary for Penn National to be in a position to meet
Westport's conditions and further criticized Westport for not being
serious about the proposal and for making a demand that was not
consistent with Westport's Stowers duty.[168]  "Finally," the letter
stated, "it is inappropriate for Westport to attempt to extract
concessions as a condition for it to honor the terms of its
insurance contract."[169]  Later, Westport's corporate representative

---

[165]    Doc. 106-5, Ex. 5 to Penn National's Mot., Letter from Mark C. Clemer
to Douglas W. Walker Dated July 31, 2012 p. 1.

[166]    Id. p. 2.

[167]    Id.

[168]    Id.

[169]    Id.

Redeker testified that the final sentence of the letter led him "to believe when [he] read it that Penn National's position was Westport had a duty to bond the entire judgment and, therefore, Penn National wasn't going to enter any kind of agreement because [it] felt as though Westport had a duty to do this."[170]

On August 7, 2012, IA as principal and Liberty Mutual Insurance Company as surety obtained a supersedeas bond in favor of Highport in the amount of $11,257,861 to stop Highport's execution efforts.[171]   Upon its filing two days later, the court clerk approved the bond.[172]   About the same time, IA sent a letter to Westport regarding its continued refusal to purchase a supersedeas bond for the full amount of the judgment.[173]   IA maintained its position that Westport was breaching its contractual obligations and, noting that Westport had recently made arrangements for the purchase of a bond in the amount of Westport's remaining limits, stated that a bond superseding a portion of the judgment "would

---

[170]     Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 p. 149.

[171]     See Doc. 104-4, Ex. J to Westport's Breach Mot., Supersedeas Bond Dated Aug. 7, 2012; Doc. 106-7, Ex. 7 to Penn National's Mot., Dep. of Bart Wulff pp. 125-26; Doc. 106-8, Ex. 8 to Penn National's Mot., Email from Bart Wulff to Boyd Wright, et al., Dated Sept. 18, 2012; Doc. 109-4, Ex. A-37 to Westport's Resp. to Penn National's Mot., Letter from Bart Wulff to Douglas W. Walker Dated Aug. 8, 2012.

[172]     See Doc. 104-4, Ex. J to Westport's Breach Mot., Supersedeas Bond Dated Aug. 7, 2012; Doc. 104-4, Ex. J to Westport's Breach Mot., State Ct. Order Dated Jan. 11, 2013.

[173]     See Doc. 109-4, Ex. A-37 to Westport's Resp. to Penn National's Mot., Letter from Bart Wulff to Douglas W. Walker Dated Aug. 8, 2012.

34

have no effect whatsoever on the enforceability of the judgment or the harm being suffered by [IA]."[174]   On August 17, 2012, Penn National offered to work out a plan for its reimbursement of IA for a percentage of the bond premium.[175]

On September 18, 2012, IA reached out to Penn National to summarize its communications with Westport regarding liability for the amount of the judgment in excess of the Westport Policy limits and regarding the supersedeas bond.[176]   Concerning the latter, IA stated its belief that Westport was "willing to withdraw its argument on the bond, to reimburse IA for the bond premium and substitute itself or one of its affiliated entities as the principal" with the following concession from Penn National:

> As consideration[,] Westport asks that, in the event the current judgment is upheld on appeal, Westport and Penn National agree that Westport will pay to Highport the remainder of its policy limits (approximately $3,3000,000) and Penn National will fund the rest.  This will be without prejudice to Penn National's right to seek reimbursement from Westport based on its equitable subrogation to IA's position that Westport is responsible for the entire judgment under the Stowers doctrine.[177]

On September 20, 2012, Penn National emailed a response to IA, asserting that Penn National "ha[d] honored and [would] continue to

---

[174]   Id. pp. 1-2.

[175]   See Doc. 19-8, Ex. B-30 to Westport's Resp. to Penn National's Mot., Email from Boyd Wright to Bart Wulff Dated Aug. 17, 2012.

[176]   See Doc. 106-8, Ex. 8 to Penn National's Mot., Email from Bart Wulff to Boyd Wright, et al., Dated Sept. 18, 2012.

[177]   Id.

honor its obligations to [IA] under the Penn National policy."[178]
Penn National accused Westport of refusing to honor its contractual
obligations.[179]  Based on its position that Westport should fulfill
its obligations to IA "without attempting to extract concessions or
agreements from Penn National," Penn National "ha[d] no desire to
enter into an agreement with Westport."[180]

The following day, IA responded to express its disappointment
that Penn National would not enter into an agreement with Westport,
stating, in part:

> As we see it[,] Westport, at this point, is agreeing
> (albeit tardily) that it will honor its contractual
> agreements with [IA] and asking that Penn National
> likewise agree to honor its contractual agreements with
> [IA] and that any dispute between the two carriers about
> the handling of the claim be settled between them without
> [IA's] involvement.
>
> . . . . As you know[,] we took strong exception to
> Westport's refusal to honor its obligation to procure a
> supersedeas bond, but now that it appears to be willing
> to redress that problem, we believe Penn National should
> likewise agree to honor its obligations to [IA].[181]

On October 15, 2012, IA sought confirmation that,

> if the current judgment in favor of Highport is affirmed
> and payment becomes due before there has been a
> resolution of the dispute concerning Westport's handling
> of the Highport case, . . . Penn National will honor its

---

[178]    Doc. 106-8, Ex. 8 to Penn National's Mot., Email from Mark C. Clemer
to Bart Wulff Dated Sept. 20, 2012.

[179]    Id.

[180]    Id.

[181]    Doc. 109-5, Ex. A-42 to Westport's Resp. to Penn National's Mot.,
Email from Bart Wulff to Mark C. Clemer, et al., Dated Sept. 21, 2012.

> insurance policy and pay its portion of the judgment
> above Westport's policy limits subject to its right to
> recover that payment from Westport via equitable
> subrogation.[182]

Responding the same day, Penn National wrote, "This will confirm that Penn National will honor its obligations to [IA] under its insurance policy."[183]   During a follow-up telephone conversation, Wulff asked Mark C. Clemer ("Clemer"), Penn National's attorney, whether the Penn National's email "meant that you, on behalf of Penn National, were giving me the assurance I had asked for earlier in the day."[184]   According to Wulff, Clemer said that it did.[185]

On October 17, 2012, Wulff sent Westport an email that stated, in part:

> [W]e now have received the requested assurance from Penn
> National that in the event the current judgment in the
> Highport case is affirmed and has to be paid [Penn
> National] will fund the payment of the amount of the
> judgment over your remaining policy limits subject to
> [Penn National's] right to seek to recover it from you.
> Accordingly, we now need to proceed to get your company
> to comply with its obligation to provide the supersedeas

---

[182]     Doc. 106-8, Ex. 8 to Penn National's Mot., Email from Bart Wulff to Mark C. Clemer, et al., Dated Oct. 15, 2012.

[183]     Doc. 106-8, Ex. 8 to Penn National's Mot., Email from Mark C. Clemer to Bart Wulff Dated Oct. 15, 2012.

[184]     Doc. 104-7, Ex. AA to Westport's Breach Mot., Letter from Bart Wulff to Mark C. Clemer Dated Nov. 3, 2015 p. 3.

[185]     See Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 pp. 175; Doc. 104-7, Ex. AA to Westport's Breach Mot., Letter from Bart Wulff to Mark C. Clemer Dated Nov. 3, 2015 p. 2; Doc. 109-5, Ex. A-47 to Westport's Resp. to Penn National's Mot., Email from Bart Wulff to James R. Redeker Dated Dec. 7, 2012.

bond.[186]

Attached was the invoice for the bond premium paid by IA.[187]

In an email dated December 5, 2012, Westport informed Marsh, the purchaser of IA, that Westport was "waiting on a copy of the agreement [Wulff said] he ha[d] with Penn National confirming Penn National's commitment."[188]   The email further stated that Westport had arranged for the bond to be issued as soon as the agreement was in hand but did not want to make the commitment above its limits without the agreement, which, Westport asseverated, had been requested more than once but not delivered.[189]   The email's author stated that he had asked Redeker to send an email to all counsel and Penn National memorializing Westport's understanding of the agreement between IA and Penn National.[190]   Westport "still want[ed]/expect[ed] a copy of the signed agreement for [its] records."[191]

---

[186]     Doc. 106-5, Ex. 5 to Penn National's Mot., Email from Bart Wulff to James R. Redeker, et al., Dated Oct. 17, 2012; see also Doc. 104-7, Ex. AA to Westport's Breach Mot., Letter from Bart Wulff to Mark C. Clemer Dated Nov. 3, 2015 pp. 2-3.

[187]     See Doc. 106-5, Ex. 5 to Penn National's Mot., Email from Bart Wulff to James R. Redeker, et al., Dated Oct. 17, 2012.

[188]     Doc. 106-5, Ex. 5 to Penn National's Mot., Email from Gregory Steele to Stephen D. Fraser Dated Dec. 5, 2012; see also Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 pp. 171-72 (stating that Wulff had informed Westport that he reached an agreement with Penn National but never produced a copy of the agreement).

[189]     See id.

[190]     See id.

[191]     Id.

Redeker never sent an email to Penn National stating his understanding of the purported agreement.[192]   Redeker never asked Penn National for a copy of the agreement.[193]   On December 7, 2012, IA forwarded the Penn National email dated October 15, 2012, to Westport and added that Penn National's attorney provided "verbal confirmation that his email was intended to give me the assurance I had requested."[194]

On December 18, 2012, IA emailed Highport regarding the supersedeas bond, stating that IA had "persuaded Westport to comply with its obligation" and requesting Highport's agreement to the substitution of the bond.[195]   On December 17, 2012, IA as principal and North American Specialty Insurance Company ("NASIC") as surety obtained a substitute supersedeas bond in favor of Highport in the same amount.[196]   The court released the original bond and directed the clerk to accept and file the substitute bond.[197]

Westport agreed "to indemnify [NASIC] for amounts in excess of

---

[192]   See Doc. 104-4, Ex. 4 to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 pp. 172-73.

[193]   See id. p. 173.

[194]   Doc. 109-5, Ex. A-47 to Westport's Resp. to Penn National's Mot., Email from Bart Wulff to James R. Redeker Dated Dec. 7, 2012.

[195]   Doc. 109-4, Ex. A-39 to Westport's Resp. to Penn National's Mot., Email from Bart Wulff to James D. Shields, et al., Dated Dec. 18, 2012.

[196]   See Doc. 104-4, Ex. J to Westport's Breach Mot., Supersedeas Bond Dated Dec. 17, 2012; Doc. 109-4, Ex. A-39 to Westport's Resp. to Penn National's Mot., Email from Bart Wulff to James D. Shields, et al., Dated Dec. 18, 2012.

[197]   See Doc. 104-4, Ex. J to Westport's Breach Mot., State Ct. Order Dated Jan. 11, 2013.

Westport's policy limits."[198]  Westport did not request that IA or Penn National agree to indemnify NASIC.[199]  At his deposition, Redeker stated his "understanding of the agreement between Penn National and Westport:"

> My understanding of the agreement was that Westport was going to go ahead and agree to bond the entire amount of the judgment and that by doing so [sic] Penn National would agree that if the deal was unsuccessful [it] -- Westport would pay [its] remaining policy limits that were owed, Penn National would then pay the remainder of the judgment amount and then seek redress against Westport through equitable subrogation if [it] felt if was needed.[200]

Redeker testified that Westport posted the supersedeas bond for the entire amount of the judgment, rather than in the amount of its remaining aggregate limit, on assurances from Penn National to IA.[201]  However, Westport did not request that Penn National confirm the assurances given to IA because, according to Redeker, every time Westport asked for "the same kind of assurance from Penn National," Penn National said "no."[202]  Westport also did not inform Penn National that Westport intended to obtain a supersedeas bond based on any assurance from Penn National.[203]

---

[198]    Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 p. 157.

[199]    See id.

[200]    Id. p. 177.

[201]    See id. pp. 178-79.

[202]    Id. p. 173.

[203]    See id.

On November 19, 2014, the Fifth Court of Appeals of Texas affirmed the judgment.[204]  On May 18, 2015, Westport notified IA that it was "prepared to pay its remaining limits to [IA] to be used as payment of a portion of the judgment or as part of settlement efforts."[205]  That letter was copied to Penn National.[206]

On June 24, 2015, IA composed a letter to Westport and Penn National asking that the insurance companies work out their differences.[207]  IA presented its understanding of the situation and described what had occurred in regard to the supersedeas bond:

> After a dispute about providing a supersedeas bond for the judgment, Westport posted a supersedeas bond in the amount of $11,257,861.00.  Penn National agreed that if the judgment was ultimately affirmed, it would make the funds available to satisfy the portion of the judgment in excess of Westport's remaining limits while reserving its right to attempt to recover its payment from Westport based on its claim that it is equitably subrogated to [IA's] claim against Westport for mishandling the defense of the case.[208]

IA expressed concern that, although a possibility of settlement with Highport existed, neither Westport nor Penn National was directing the defense.[209]  According to IA, Westport was willing to

---

[204]    See Insurance Alliance v. Lake Texoma Highport, LLC, 452 S.W.3d 57 (Tex. App.—Dallas 2014, pet. denied).

[205]    Doc. 104-5, Ex. K to Westport's Breach Mot., Letter from Douglas W. Walker to Bart Wulff Dated May 18, 2015.

[206]    See id.

[207]    See Doc. 109-7, Ex. B-13 to Westport's Resp. to Penn National's Mot., Letter from Bart Wulff to Douglas W. Walker, et al., Dated June 24, 2015.

[208]    Id. p. 2.

[209]    Id. p. 3.

allow Penn National to take control of settlement efforts if Penn National wished to do so, but Penn National was unwilling to relieve Westport of the duty to defend.[210]  Wulff opined that the decision on settlement efforts belonged to Westport, on which the duty to defend rested, but that settlement could not be accomplished without Penn National's willingness to contribute funds.[211]  Wulff suggested that the insurance companies agree to allow Penn National to lead in negotiating a settlement.[212]

On June 25, 2015, Westport responded to IA's letter of the previous day, stating, in part:

> Westport is willing to direct defense counsel and engage in settlement negotiations provided that Penn National commits, in writing, that it will fund the amount of any settlement in excess of Westport's remaining aggregate limits.  Alternately, Westport will tender its limits to Penn National for its use in settlement negotiations.[213]

In a letter dated October 21, 2015, Westport notified Penn National that IA proposed $7 million as an opening offer to settle the Highport case before the Supreme Court of Texas' ruling on the petition for review.[214]  The letter further stated:

> Given the fact that now may be the best chance to reach

---

[210]    See id.

[211]    See id.

[212]    See id.

[213]    Doc. 104-5, Ex. L to Westport's Breach Mot., Letter from Douglas W. Walker to Bart Wulff Dated June 25, 2015.

[214]    See Doc. 104-6, Ex. Y to Westport's Breach Mot., Letter from Douglas W. Walker to Mark C. Clemer Dated Oct. 21, 2015.

a settlement, Westport urges Penn National to honor its
contractual obligations and provide defense counsel with
the requested authority and that Penn National agree to
fund its share of any settlement.[215]

A day later, Penn National responded that Westport's responsibility
in the matter was "far greater" than its remaining policy limits,
considering Westport's responsibility for interest, attorneys'
fees, costs, and claim expenses, as well as its obligations
pursuant to breaching its Stowers duty to settle within the limits
of its policy "even as it was clear from defense counsel's reports
that Highport's case against [IA] was improving. . . .
Consequently, Westport is obligated to satisfy the entire judgment
against [IA]."[216]

On October 23, 2015, the Supreme Court of Texas denied the
petition for review.[217]  In a third letter dated October 26, 2015,
Westport acknowledged the denial of the petition for review and
reiterated that it was prepared to pay the remaining aggregate
limit remaining under its policy ($3,336,664.29), plus $459,413.46
in prejudgment interest and $612,198.26 in postjudgment interest.[218]
The letter asserted that the remainder of the judgment amount was

---

[215]   Id. p. 1.

[216]   Doc. 104-6, Ex. Z to Westport's Breach Mot., Email from Mark C.
Clemer to Douglas W. Walker, et al., Dated Oct. 22, 2018.

[217]   See Doc. 104-5, Ex. L to Westport's Breach Mot., Letter from Douglas
W. Walker to Bart Wulff Dated June 25, 2015.

[218]   Doc. 104-5, Ex. M to Westport's Breach Mot., Letter from Douglas W.
Walker to Mark C. Clemer Dated Oct. 26, 2015 p. 1.

Penn National's responsibility.[219]  Westport requested "that Penn National confirm that it [would] honor its obligation to [IA] and pay its share of the judgment."[220]

On October 28, 2015, Penn National challenged Westport's calculations on interest and its omission of responsibility for attorneys' fees, costs, and other claim expenses.[221]  More significantly, Penn National asserted that Westport was responsible for the entire judgment because it failed to accept a reasonable settlement demand within the Westport Policy limits.[222]  The letter concluded, "Westport should focus on honoring its obligations to [IA] instead of writing letters to Penn National."[223]

On November 3, 2015, IA sent a letter to Penn National expressing concerns about Penn National's position and approach:

> To date your responses have been limited to essentially irrelevant complaints about Westport's handling of the claim and objections to Rick Oldenettel's efforts to get the information necessary to organize timely payment of the judgment once the final amount due has been determined.  Although your letters have not contained a threat that Penn National will not honor its obligation to [IA], they have not included any affirmation that Penn National does intend to honor its obligation. Moreover, the letters have not reflected any progress towards making the necessary arrangements for Penn National to

---

[219]    See id.

[220]    Id. p. 2.

[221]    See Doc. 109-8, Ex. B-16 to Westport's Resp. to Penn National's Mot., Letter from Mark C. Clemer to Douglas W. Walker Dated Oct. 28, 2015.

[222]    See id.

[223]    Id.

timely honor its obligation. Accordingly, I feel
compelled to write you to demand on behalf of Penn
National's insured, [IA], that Penn National make
appropriate arrangements to comply with its obligation to
[IA] to pay the amount of the judgment in excess of
Westport's retained limits.[224]

IA argued that the Penn National Policy required payment and
asseverated that Penn National entered a "2012 Agreement to Pay"
when it responded that it would honor its obligations under the
Penn National Policy to IA's October 2012 email requesting
confirmation that Penn National would pay its portion of the
judgment when due regardless of the status of its dispute with
Westport.[225]

In a letter dated December 23, 2015, IA pressed Penn National
to resolve all issues with Westport before the judgment was due.[226]
IA referred to the resolution of the supersedeas bond issue as
occurring after Penn National "agreed to honor its obligations
under its insurance policy to pay any final judgment and Westport,
based in part on that undertaking, purchased a bond sufficient to
supersede the entire judgment."[227]

On January 15, 2016, the Supreme Court of Texas denied

---

[224]    Doc. 104-7, Ex. AA to Westport's Breach Mot., Letter from Bart Wulff
to Mark C. Clemer Dated Nov. 3, 2015 p. 2.

[225]    Id. p. 3.

[226]    See Doc. 109-8, Ex. B-18 to Westport's Resp. to Penn National's Mot.,
Letter from Bart Wulff to Mark C. Clemer Dated Dec. 23, 2015 p. 2.

[227]    Id. p. 3.

45

rehearing of the petition for review.[228] Highport immediately filed a motion for judgment against NASIC as surety on the supersedeas bond.[229] A few days later, IA prepared a letter to Penn National in an attempt to arrange for Penn National's payment of the excess portion of the judgment.[230] IA anticipated Highport's immediate initiation of garnishment actions against IA and threatened Penn National with a damage claim for failure to comply with its policy should it not make payment on the judgment in excess of Westport's limits.[231] IA demanded that Westport and Penn National attend a mediation to resolve their disputes.[232]

On January 20, 2016, the Fifth Court of Appeals of Texas issued a mandate affirming the trial court's judgment.[233]

### 4.   Post-Mandate

On January 21, 2016, Highport sent IA a letter stating that the "judgment [was] final on appeal" and demanding that IA immediately pay the full amount of the judgment or face collection

---

[228]   See Doc. 106-8, Ex. 8 to Penn National's Mot., Denial of Rehr'g of Pet. of Rev.; Insurance Alliance v. Lake Texoma Highport, LLC, 452 S.W.3d 57 (Tex. App.—Dallas 2014, pet. denied).

[229]   See Doc. 109-8, Ex. B-19 to Westport's Resp. to Penn National's Mot., Mot. for J. Against Surety.

[230]   See Doc. 106-8, Ex. 8 to Penn National's Mot., Letter from Bart Wulff to Mark C. Clemer, et al., Dated Jan. 19, 2016.

[231]   Id. p. 2.

[232]   Id.

[233]   See Doc. 104-5, Ex. N to Westport's Breach Mot., Mandate.

efforts.[234]   On January 22, 2016, IA sent an email to Penn National
that called on it to "honor its obligations to [IA] under its
policy" or be held responsible for any damages it incurs.[235]

On January 25, 2016, Highport sent a letter to NASIC demanding
payment of the full bond amount and threatening collection
action.[236]   In response to the letters threatening collection
action, IA, Westport, and NASIC entered negotiations with Highport
to avoid attempts to collect on the judgment.[237]   Penn National did
not participate in those negotiations and did not respond to
communications from IA regarding those negotiations.[238]   That same
day, IA referred to Highport's efforts to arrange for payment of
the judgment as "premature inasmuch as . . . [Highport] filed a
motion with the trial court which acknowledge[d] that further
action is necessary by the trial court to determine the correct
computation of the amount due on the judgment.[239]   IA informed

---

[234]     See Doc. 104-5, Ex. O to Westport's Breach Mot., Letter from Bart F.
Higgins to Debora Alsup, et al., Dated Jan. 21, 2016.

[235]     Doc. 109-8, Ex. B-21 to Westport's Resp. to Penn National's Mot.,
Email from Bart Wulff to Douglas W. Walker Dated Jan. 22, 2016.

[236]     See Doc. 104-5, Ex. P to Westport's Breach Mot., Letter from Bart F.
Higgins to Robert M. Fitzgerald Dated Jan. 25, 2016.

[237]     See Doc. 104-5, Ex. Q to Westport's Breach Mot., Dep. of Bart Wulff
pp. 97-98, 104.

[238]     See Doc. 104-5, Ex. S to Westport's Breach Mot., Letter from Bart
Wulff to Mark C. Clemer Dated Jan. 28, 2016 p. 1; Doc. 104-6, Ex. U to Westport's
Breach Mot., Letter from Douglas W. Walker, et al., to Mark C. Clemer Dated Feb.
18, 2016.

[239]     Doc. 109-8, Ex. B-31 to Westport's Resp. to Penn National's Mot.,
Letter from Bart Wulff to Bart Higgins Dated Jan. 25, 2016.

Highport that the entire judgment was covered by insurance and referred Highport to attorneys for Westport and Penn National.[240]

In a letter to Penn National dated January 28, 2016, IA requested that Penn National either "step up and take over the negotiations for payment of the judgment" or provide IA "an unequivocal agreement" that IA's attempts to reduce the judgment through negotiations would not waive IA's right to recover damages from Penn National resulting from "Penn National's failure to comply with its contractual obligations."[241] The letter stated, "In the absence of a response from you, we will not initiate settlement discussions with Highport."[242]

On January 28, 2016, IA, Westport, and NASIC entered into a memorandum of understanding ("MOU") with Highport that required NASIC's payment to Highport of the undisputed amount of the judgment ($9,936,492.65), NASIC's payment of the bond's balance ($1,321,368.35) into the court's registry until all remaining issues, including any settlement credit due IA for funds paid by CRC in settlement of its claims in exchange for Highport's agreement to suspend collection activities pending the trial

---

[240]   See id.

[241]   Doc. 104-5, Ex. S to Westport's Breach Mot., Letter from Bart Wulff to Mark C. Clemer Dated Jan. 28, 2016 p. 2.

[242]   Id.

court's determination of the balance due on the judgment.[243]

In a letter dated February 8, 2016, IA asserted that Penn National's position that Westport mishandled the Highport case was, "at this juncture, simply legally irrelevant" because the <u>Stowers</u> claim was IA's "to raise and until such time as Penn National ha[d] paid on the policy and therefore [had] become equitably subrogated to [IA's] position, Penn National ha[d] no interest in or legal ability to assert any <u>Stowers</u> claim."[244]  IA pointed out that the Penn National Policy contained "no language of any kind" that "would give Penn National the option to avoid payment of its contractual obligation based on a claim that the primary carrier mishandled the defense of the case."[245]

IA asserted that the Highport judgment was "now final" because it had been "appealed to the highest court of the State of Texas and affirmed on all levels.[246]  The letter continued:

> Under these circumstances, Penn National should have long since stepped up and taken responsibility for making the payments it is obligated to make under its policy. Rather than doing so, it has consistently refused to respond to requests to honor its obligation to its insured.  As a result, the surety has been force to pay a substantial amount of the judgment, and it may very

[243]   <u>See</u> Doc. 104-5, Ex. M to Westport's Breach Mot., Letter from Douglas W. Walker to Mark C. Clemer Dated Oct. 26, 2015 p. 1; Doc. 104-5, Ex. Q to Westport's Breach Mot., Dep. of Bart Wulff  pp. 97-98; Doc. 104-6, Ex. T to Westport's Breach Mot., MOU.

[244]   Doc. 104-7, Ex. CC to Westport's Breach Mot., Letter from Bart Wulff to Mark C. Clemer Dated Feb. 8, 2016 p. 1.

[245]   <u>Id.</u> p. 2.

[246]   <u>Id.</u>

49

well be the case that, within a matter of a few days,
Highport will begin to execute against [IA] to collect
the remainder of the judgment.  If that happens, [IA]
intends to hold Penn National responsible for all of the
damages and attorney's fees resulting from Penn
National's bad faith breach of its contract of insurance.

[IA] has repeatedly demanded that Penn National
honor its obligations and that it meet with Westport to
work out the appropriate split of the amount due on the
judgment between the remaining limits under the primary
policy and the total amount of the judgment which is the
amount Penn National is obligated to pay.

To make matters even worse, before Westport posted
the appeals bond, I asked you [Clemer] personally for
a[n] assurance that if Westport secured the bond and, if
the judgment was affirmed, Penn National would honor its
obligation under its policy and pay Penn National's share
of the judgment.  You personally provided me with the
assurance that Penn National would do so.

If Penn National believes that Westport failed to
properly exercise its responsibility to defend the case,
it is clear under Texas law that the recourse for that is
for Penn National to pay the amount due and then assert
that it is equitably subrogated to [IA's] claims against
Westport.  I am taking no position on whether your
contentions about Westport are or are not correct.  They
are simply irrelevant to Penn National's contractual duty
to [IA], which we demand that you honor, both to comply
with the Penn National insurance policy itself and with
the personal assurance which you provided me.[247]

Effective February 12, 2016, IA and Westport executed an

assignment of rights that stated:

IA unconditionally and absolutely conveys, transfers
and/or assigns to Westport all of its rights, interests,
claims and causes of action against Penn National
relating to or arising out of the lawsuit, the judgment
and/or the Penn National Policy, including, but not
limited to, claims for extra-contractual or bad faith

---

[247]   Id. pp. 2-3.

damages.[248]

Pursuant to the indemnity agreement with NASIC, Westport reimbursed NASIC for its payment to Highport in the amount of $9,936,492.65.[249]

One day after Westport reimbursed NASIC on February 17, 2016, Westport notified Penn National that the primary policy was exhausted and asserted that Penn National's duty to pay the "ultimate net loss" in excess of the Westport Policy limits was triggered by exhaustion of the underlying policy and that Penn National's duty to defend was triggered as of the date of Westport's payment.[250] In response to Penn National's Stowers argument, Westport stated, "[T]he notion that an insurer can pay nothing yet still attempt to assert subrogation rights is legally wrong."[251]

Westport justified paying the undisputed amount of the judgment ($9,936,492.65) as necessary "to protect [IA] from collection efforts threatened by Highport."[252] Westport's position was that collection efforts were premature because the allocation issue was decided, but it was concerned that "there was no

---

[248]    Doc. 68-4, Ex. D to Westport's Am. Compl., Assignment of Rights p. 4.

[249]    See Doc. 104-6, Ex. U to Westport's Breach Mot., Letter from Douglas W. Walker, et al., to Mark C. Clemer Dated Feb. 18, 2016.

[250]    See id.

[251]    Id. pp. 1-2.

[252]    Id. p. 2.

guarantee the trial court would ultimately have decided the issue in [IA's] favor."[253]   The letter concluded:

> Given Penn National's repeated refusal to honor its contractual obligations, Westport will continue to protect [IA] and will take whatever steps it deems appropriate and necessary to accomplish this.   Westport will seek reimbursement from Penn National for its share of the judgment and defense costs, as well as all other costs and damages allowable under the law.[254]

In a letter also dated February 18, 2016, IA responded to a Penn National letter of February 12, 2016.[255]   IA took the position that "Penn National should at this point immediately reimburse Westport for the portion of the payment which was in excess of Westport's retained limits."[256]   Regarding control of the defense of the case, IA noted Penn National's "unwilling[ness] to step up and take responsibility" and "assume[d] that, since Penn National ha[d] chosen not to participate, it [would] not second guess Westport's tactical decisions on how to proceed" with regard to Highport's settlement overtures.[257]   The final paragraph of the letter included the following statements:

> It is unquestionably correct that the significance of the assurances that you [Clemer] gave me [Wulff] about Penn

---

[253]    Id.

[254]    Id.

[255]    See Doc. 104-7, Ex. DD to Westport's Breach Mot., Letter from Bart Wulff to Mark C. Clemer Dated Feb. 18, 2016.
The court was unable to locate in the record the Penn National letter to which this letter purported to respond.

[256]    Id. p. 1.

[257]    Id. pp. 1-2.

National's position is derived from the fact that you were speaking as the authorized spokesman of Penn National, not because you were speaking on your own behalf. As the attorney of record for Penn National, I assume that you would not have given me the assurance if you did not have full authority from your client to do so[,] and I assume that your client accepts that it is bound by the assurance that you gave me. I also assume it is not in question by any of us who practice in this area of the law that although Penn National undertook certain obligations by issuing its policy of insurance, it is by no means unusual for a carrier's retained coverage counsel to agree to a commitment to the carrier's insured which is more specific than the contract of insurance itself and that agreement is binding on [its] client. It is Penn National, not you individually, who we expect to honor the obligation which you accepted on behalf of Penn National.[258]

On April 19, 2016, Highport filed an application for turnover order to facilitate IA's transfer of its claims against Westport and Penn National to a receiver who would sell the claims in partial satisfaction of Highport's judgment.[259] In a letter dated May 16, 2016, IA wrote Penn National "with the hope" that Penn National would "finally honor its obligations to [IA]."[260] IA demanded that Penn National appear at the turnover hearing with sufficient funds to satisfy any remaining amount due on the judgment after release of the funds in the court's registry.[261]

On June 6, 2016, the trial court determined the balance due to

---

[258]   Id. p. 2.

[259]   See Doc. 109-8, Ex. B-26 to Westport's Resp. to Penn National's Mot., Letter from Bart Wulff to Mark C. Clemer Dated May 16, 2016.

[260]   Id. p. 1.

[261]   See id.

53

Highport to be $1,697,820.48 as of May 31, 2016, and released the funds in the court registry to Highport in partial satisfaction of the judgment.[262]  Westport reimbursed NASIC for the amount released from the court registry ($1,321,368.35).[263]  On June 13, 2016, Penn National paid the remaining amount of the judgment ($379,885.78) to Highport.[264]

C.  **The Procedural History of This Action**

On March 24, 2016, three months prior to the final payment to Highport, Westport filed this action in the United States District Court for the Middle District of Pennsylvania against Penn National, alleging breach of contract and promissory estoppel on a supersedeas bond, breach of Penn National's insurance contract with IA, and violations of the Texas Insurance Code.[265]  On May 6, 2016, Penn National filed an answer.[266]  On July 1, 2016, the Pennsylvania court granted Penn National's motion to transfer venue and transferred the case to this court.[267]

After the case was transferred, Penn National filed a

---

[262]   Doc. 68-5, Ex. E to Westport's Am. Compl., Ord. on Mot. to Determine Balance Due on J.

[263]   Doc. 103-3, Ex. C to Westport's <u>Stowers</u> Mot., Westport's Resps. & Objs. to Penn National's 1st Set of Interrogs. Resp. No. 7.

[264]   Doc. 109-8, Ex. B-35 to Westport's Resp. to Penn National's Mot., Tr. of Voice Mail.

[265]   <u>See</u> Doc. 1, Westport's Compl. pp. 15-21.

[266]   <u>See</u> Doc. 17, Penn National's Orig. Ans.

[267]   <u>See</u> Doc. 33, Ord. Dated July 1, 2016; Doc. 34, Docket Notation Dated July 1, 2016.

counterclaim with leave of court.[268]   In addition to seeking declaratory relief, Penn National asserted causes of action for violations of the Stowers duty and violations of the Texas Insurance Code.[269]   On March 28, 2017, the parties filed a stipulation that allowed each to file amended pleadings by April 17, 2017.[270]

On April 13, 2017, Penn National was the first to file its amendment.[271]   Therein, Penn National omitted all claims for relief based on the Texas Insurance Code.[272]   On April 17, 2017, Westport filed its amended complaint, which dropped the claims under the Texas Insurance Code, updated and supplemented factual and damages allegations, and subdivided the breach of Penn National's insurance contract with IA into three claims according to the method by which Westport acquired the right to pursue it.[273]   Westport also added a request for declaratory judgment stating that its policy was exhausted and that Penn National must reimburse Westport for the

---

[268]   See Doc. 62, Ord. Dated Feb. 15, 2017; Doc. 63, Penn National's Orig. Countercl.

[269]   See Doc. 63, Penn National's Orig. Countercl. pp. 9-12.

[270]   See Doc. 65, Stipulation of the Parties Concerning the Pleadings; Doc. 66, Stipulation & Ord. Dated Apr. 11, 2017.

[271]   See Doc. 67, Penn National's Am. Countercl.

[272]   See id.

[273]   See Doc. 65, Stipulation of the Parties Concerning the Pleadings p. 1; Doc. 68, Westport's Am. Compl. pp. 15-18.

amounts it paid in excess of its policy limits.[274]   The parties filed answers to the respective pleadings.[275]

In January 2018, after a period of discovery, the parties each timely filed a motion targeting the other's expert testimony, as well as the pending dispositive motions.[276]   On April 18, 2018, the parties unsuccessfully attempted mediation.[277]

The pending motions are fully briefed.   The court addresses the dispositive motions here, separately addressing the motions to strike/exclude expert testimony.[278]

## II.   Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists on any material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Stauffer v. Gearhart, 741 F.3d 574, 581 (5th Cir. 2014).   A material fact is a fact that is identified by applicable substantive law as critical

---

[274]   See Doc. 68, Westport's Am. Compl. p. 18.

[275]   See Doc. 69, Westport's Ans. & Affirmative Defenses to Penn National's Am. Countercl.; Doc. 70, Penn National's Ans. to Westport's Am. Compl.

[276]   See Doc. 102, Westport's Mot. to Strike Penn National's Experts, Terry Fitzgerald & Thomas Wright; Doc. 103, Westport's Stowers Mot.; Doc. 104, Westport's Breach Mot.; Doc. 105, Penn National's Mot. to Exclude the Test. & Opinions of Peter J. Hildebrand; Doc. 106, Penn National's Mot. for Partial Summ. J. on Westport's Causes of Action for Breach of Contract & Promissory Estoppel.

[277]   See Doc. 120, Mediator's Report.

[278]   The pending motions to strike/exclude expert testimony have no bearing on the conclusions reached in this Memorandum and Recommendation.   The experts' opinions provide the court no assistance on the law and do not move the needle on the facts for purposes of summary judgment.   At most, they only affirm the court's determination that certain fact issues remain.

to the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party.  See Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013)(quoting Anderson, 477 U.S. at 248).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  The movant may meet this burden by demonstrating an absence of evidence in support of one or more elements of the case for which the nonmovant bears the burden of proof.  See Celotex Corp., 477 U.S. at 322; Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party carries its burden, the nonmovant may not rest on the allegations or denials in his pleading but must respond with evidence showing a genuine factual dispute.  Stauffer, 741 F.3d at 581 (citing Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)).

### III. Analysis

The first filed of Westport's two motions for partial summary judgment asks the court to find that, as a matter of law, four of

the five settlement demands identified by Penn National did not trigger the duty enunciated in G.A. Stowers Furniture Co. v. Am. Indem. Co. [hereinafter Stowers], 15 S.W.2d 544 (Tex. 1929).  The other of Westport's pending dispositive motions seeks partial summary judgment on its claim that Penn National breached its duties to defend and indemnify under the insurance policy notwithstanding any negligence on Westport's part and that, should Penn National be entitled to recover upon a finding that Westport acted negligently, its recovery or offset would be limited to the amount it actually paid.   Penn National's motion for partial summary judgment challenges Westport's claims of breach of contract and promissory estoppel regarding Westport's posting of the supersedeas bond.

## A.  **Westport's Stowers Motion**

Insurers have the duty, under certain circumstances, to settle claims against their insureds within policy limits.  See OneBeacon Ins. Co. v. T. Wade Welch & Assocs., 841 F.3d 669, 678 (5th Cir. 2016)(citing Tex. Farmers Ins. Co. v. Soriano, 881 S.W.2d 312, 314-15 (Tex. 1994)); G.A. Stowers Furniture Co. v. Am. Indem. Co., 15 S.W.2d 544, 547 (Tex. 1929)).  When insurers fail to fulfill that duty, they may be found liable for negligently failing to do so.  OneBeacon Ins. Co., 841 F.3d at 678.

The Stowers duty applies when "three prerequisites are met: (1) the claim against the insured is within the scope of coverage,

(2) the demand is within the policy limits, and (3) the terms of the demand are such that an ordinarily prudent insurer would accept it, considering the likelihood and degree of the insured's potential exposure to an excess judgment." Id. (quoting Am. Physicians Ins. Exch. v. Garcia, 876 S.W.2d 842, 849 (Tex. 1994)); see also Seger v. Yorkshire Ins. Co., 503 S.W.3d 388, 395-96 (Tex. 2016); Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co., 236 S.W.3d 765, 776 (Tex. 2007).   To qualify as a Stowers demand, the settlement offer must also provide the insured a full release.   Id. (citing Am. Physicians Ins. Exch. v. Garcia, 876 S.W.2d at 849).

Westport argues that, as a matter of law, four of Highport's settlement offers during the protracted, unsuccessful settlement efforts did not trigger Westport's Stowers duty to settle.   The first challenged offer was the self-described Stowers demand presented at the end of the first mediation on May 2009.   The second challenged offer was the self-described Stowers demand presented in advance of the second mediation in May 2010.   The third and fourth challenged offers were presented in July 2010 and November 2010 as collective offers to IA, CRC, and Bowood.

### 1.  May 2009 $2 Million Demand

Regarding Highport's $2 million demand on May 20, 2009, Westport argues that the demand did not satisfy the third prerequisite for a Stowers demand, which requires reasonableness. In 1994, the Supreme Court of Texas stated that the ultimate

Stowers issue is "whether the claimant's demand was reasonable under the circumstances, such that an ordinarily prudent insurer would accept it." Am. Physicians Ins. Exchange v. Garcia, 876 S.W.2d 842, 849 (Tex. 1994). Absent a reasonable opportunity to settle within policy limits, shifting the risk of an excess judgment onto the insurer is inappropriate. Id. The Fifth Circuit interpreted "reasonable opportunity" to have both substantive and procedural components. See American Insurance Company v. Assicurazioni Generali SpA [hereinafter Assicurazioni Generali], 228 F.3d 409, at *5 (5th Cir. 2000)(unpublished). "[T]he former refer[s] to the reasonableness of the terms of the offer, and the latter concern[s] the amount of time to either accept or reject the offer given the consequences of the decision." Id.

Westport points to four aspects of the surrounding circumstances that, it contends, establish that it did not have a reasonable opportunity to settle on May 20, 2009: (1) the Highport lawsuit was in the preliminary stages; (2) very little discovery had taken place; (3) IA had not had the opportunity to evaluate the merits of the parties' positions; and (4) the time limit for a decision was forty-five minutes.

The first three aspects that Westport identifies all relate to whether enough information about the Highport lawsuit was available to IA/Westport at the time of the demand to weigh the likelihood and degree of Westport's potential exposure to an excess judgment.

60

While the stage of the lawsuit, discovery, and merits evaluation are pertinent factors in determining whether an insurer has a reasonable opportunity to settle, other circumstances in this case raise equally pertinent factors that weigh against Westport's position.

In January 2008, prior to his being retained, Oldenettel was privy to the details of a meeting between IA's CEO and a Highport representative in which Highport informed IA that Highport's best legal case appeared to be against Lloyd's and IA.  In the communication with Oldenettel, IA's CEO admitted that the procurement of the policy was accomplished over the phone at the last minute, that the renewal policies in IA's possession were only partially complete, and that Highport's coverage was "woefully short of the promised coverage"[279] in the range of $5 to $10 million.  Oldenettel also knew that Highport had tried to "rectify the situation"[280] by communicating with Lloyds to no avail.

When the case was filed, fifteen months after that communication between IA's CEO and Oldenettel, Westport noted in its reservation-of-rights letter to IA that Highport's counsel believed the case to be worth "well in excess of [IA's] $5,000,000

---

[279]    Doc. 112-8, Ex. 8A to Penn National's Resp. to Westport's <u>Stowers</u> Mot., Email from Rock Houstoun to Rick Oldenettel, et al., Dated Jan. 13, 2008 p. 1.

[280]    <u>Id.</u> p. 2.

in coverage with [Westport],"[281] indicating that Westport at least had knowledge of Highport's valuation.  Slightly more than a year later and just a few days before the mediation, Oldenettel stated that no discovery had taken place; yet, he wrote a fourteen-page assessment of the case, in which he indicated that he was in possession of 3,587 documents from CRC and approximately 900 documents concerning Highport's damages, all of which he intended to review before the mediation.  Oldenettel also knew of Lloyd's payments in excess of $1.5 million, Highport's repair costs in excess of $3.6 million, both Highport's adjusters' damages estimate in excess of $8.2 million and Lloyd's' adjusters estimate in excess of $3.1 million, and Highport's business interruption claim in excess of $1 million.

Westport did not attend the mediation, and IA's best offer was $20,000.  Highport's mediation demand was $8.1 million, and Lloyd's' offer was $3.5 million.  At the end of an apparently long day of mediation, Highport presented the $2 million demand to IA, and IA/Westport failed to respond.  Despite Oldenettel's opinion that mediation was "extremely premature,"[282] IA/Westport was expected, as all parties to mediation are, to participate in good faith.

---

[281]    Doc. 103-5, Ex. J to Westport's <u>Stowers</u> Mot., Letter from James R. Redeker to Jim Berger Dated Apr. 16, 2008.

[282]    Doc. 103-6, Ex. N to Westport's <u>Stowers</u> Mot., Letter from Rick Oldenettel to James R. Redeker, et al., Dated May 15, 2009 p. 1.

Given all of the above information in the possession of IA/Westport, Westport's general assertions that the mediation was held early in the lawsuit, the discovery process was not far along, and the merits had not been evaluated hardly present an absence of genuine fact as to the reasonableness of the Westport's opportunity to settle within its policy limits. The other circumstances of the May 2009 $2 million demand are such that a reasonable jury could find that an ordinarily prudent insurer would have accepted it in light of the likelihood and degree of Westport's potential exposure to an excess judgment.

The fourth aspect of the May 2009 $2 million demand identified by Westport as preventing it from having a reasonable opportunity to settle was the forty-five-minute deadline. This calls into question procedural reasonableness. One court described "the question whether an insurer . . . had a reasonable amount of time to respond to a <u>Stowers</u> demand" as "present[ing] a quintessential, constituent fact issue that is subsumed within the jury's application of the reasonably prudent insurer standard." <u>Bramlett v. Med. Protective Co. of Ft. Wayne, Ind.</u>, Civil Action No. 3:10-CV-2048-D, 2013 WL 796725, at *5 (N.D. Tex. Mar. 5, 2013)(unpublished).

In this case, the time for a decision was undeniably short. The Fifth Circuit has not set a minimum threshold for finding the amount of time given to respond to be reasonable as a matter of law

but, rather, considers the reasonableness of the amount of time within the context of the demand.  In <u>Assicurazioni Generali</u>, the Fifth Circuit considered whether a demand presented during an afternoon recess six days into a trial that was set to expire just under twenty-three hours later provided a reasonable opportunity to settle.  <u>See</u> <u>Assicurazioni Generali</u>, 228 F.3d at **1-2.  There, the defense attorney transmitted the demand three hours after receiving it to the out-of-state third-party claims administrator with the authority to settle the case.  <u>See</u> <u>id.</u> at *2.  Upon receipt, the claims administrator began analyzing it and flew to the trial location the following morning to review the files and to consult the defense attorney.  <u>See</u> <u>id.</u>  Although the defense attorney recommended that the demand be accepted, the claims administrator allowed it to expire.  <u>See</u> <u>id.</u>  The Fifth Circuit determined that whether the insurer acted reasonably in not accepting the plaintiffs' offer was a fact question not amenable to summary judgment.  <u>Id.</u> at *6.

Granted, twenty-three hours is notably more than forty-five minutes.  However, the Fifth Circuit's guidance in that case is helpful to this court's review of the demand sub judice.  The situation surrounding the twenty-three-hour time limit in <u>Assicurazioni Generali</u> differed significantly from the case here. In <u>Assicurazioni Generali</u>, the person with authority to settle was in another state when the offer was made and traveled to the trial

site in order to analyze the demand.  Id. at *2.  Here, the parties were engaged in a lengthy, active mediation, where each party had a representative with settlement authority present.  IA/Westport's knowledge, prior to mediation, that the claimed damages exceeded the policy limits arguably alerted IA/Westport, before the mediation even began, of the need to consider the consequences of a decision to accept or reject a demand within the policy limits.

Given the context, the court is not willing to take the "quintessential, constituent fact issue" away from the jury. Bramlett, 2013 WL 796725, at *5.  Like the Bramlett court on the facts before it, this court cannot find, as a matter of law, that Westport lacked sufficient time to accept the May 2009 $2 million demand.[283]

## 2.  May 2012 $4.9 Million Demand

Regarding Highport's $4.9 million demand on May 12, 2010, Westport argues that the demand was not within policy limits at the time it was made.  Westport contends that, because its remaining aggregate policy limit was approximately $4.3 million on the date of the demand, it did not trigger Westport's Stowers duty.

Westport submitted evidence that, on March 3, 2010, it paid a claim to Delta Seaboard in the amount of $686,826.89.  The payment of that claim reduced the Westport Policy limits to $4,313,173.11,

---

[283]   Expert testimony as to whether forty-five minutes presented a reasonable opportunity does not inform the court's legal determination.

65

an amount less than the demand.[284]  Even if a demand in excess of policy limits meets the reasonableness element, it "does not trigger the <u>Stowers</u> duty to settle." <u>Mid-Continent Ins. Co.</u>, 236 S.W.3d at 776.

As the evidence conclusively demonstrates that the May 2012 $4.9 million demand was not within the Westport Policy aggregate limit, the court finds that, as a matter of law, Westport's <u>Stowers</u> duty was not triggered at that time.

### 3.  July 2010 and November 2010 $3.6 Million Counteroffers

Regarding Highport's two $3.6 million counteroffers in July and November 2010, Westport argues that these oral demands were not sufficiently definite with regard to the terms and conditions, stating in support that "there is no evidence whatsoever of the terms and conditions of the settlement being proposed by Highport."[285]

The facts suggest that Westport is overstating its bewilderment and cluelessness during the settlement process. The written demands in May 2009, September 2009, and May 2010 offered IA a full release in exchange for the payment of money.  The

---

[284]     Penn National questioned whether the payment Delta Seaboard was for a claim made during Highport's 2007-2008 policy period and, thus, was applicable to the Highport aggregate limit.  Westport submitted evidence in connection its reply in support of its <u>Stowers</u> motion that confirms the claim was made during the relevant policy period.  <u>See</u> Doc. 117-4, Ex. 5 to Westport's Reply in Support of its <u>Stowers</u> Mot., Gen. Liability Not. of Cl.

[285]     Doc. 103-1, Westport's Mem. of Law in Support of its <u>Stowers</u> Mot. p. 16.

parties had attended two mediations at which the terms and conditions of the offers were undoubtedly discussed. After the second mediation, the mediator recommended a collective settlement proposal that provided for mutual releases and dismissal of all claims. That proposal was not accepted by everyone as required by the mediator for settlement.

Thereafter, IA, CRC, and Bowood began to negotiate among themselves the amount of a "counter" to Highport. The parties remained in contact with the mediator and, at one point, considered his re-involvement. They also borrowed the mediator's method in that they did not reveal the amount contributed by each defendant. During the negotiation process, the emails among IA, CRC, and Bowood indicated that only the amounts of contribution were at issue. After reaching an agreement on the amounts to be contributed, the settlement conversation with Highport was re-initiated with a collective offer of $1.8 million, which was met with a Highport demand of $3.6 million.

A few months later, the defendants increased the collective offer to $2.1 million, which was again met with a demand of $3.6 million. The evidence of the parties' settlement efforts during this time allows an inference that they were continuing where the mediator's failed proposal left off pursuant to the same terms and conditions. Email communications among the remaining defendants addressed only the amount to be offered by each, providing

additional support for an inference that the only term or condition at issue was the final amount to be paid by each party.  Nothing in the evidence suggests that any other term or condition of settlement was or ever had been a point of contention.  Contrary to Westport's assertion, the record does contain evidence, albeit circumstantial, of the terms and conditions of the settlement being proposed by Highport.

Moreover, the parties' apparent facility in negotiation and lack of concern about any terms or conditions other than the financial contribution of each party could lead a reasonable jury to the conclusion that the terms were clear to and undisputed by those parties involved.  This is the distinguishing feature of the settlement process in this case from that in <u>Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh</u>, 77 S.W.3d 253 (Tex. 2002).  In that case, the court applied the <u>Stowers</u> framework to a claim under the Texas Insurance Code.  <u>See</u> <u>id.</u> at 261-62.  There, the "record reveal[ed] great confusion about that offer's terms[:]"

> At the meeting, [the underlying plaintiffs' attorney] requested a structured settlement worth $4.5 million.  At trial, [the attorney] testified that he intended that figure to settle only the adults' claims[] and that he was willing to settle the children's claims for $1.8 million, for a total combined settlement of $6.3 million.

<u>Id.</u> at 263.  The court held that "an insurer should not be held liable for failing to accept an offer when the offer's terms and scope are unclear or are the subject of dispute."  <u>Id.</u>  In cases where the settlement terms are clear and undisputed, the court

allowed, a formal settlement demand would not be absolutely necessary.

The facts of this case, particularly the course of communications and continuing settlement efforts, could allow a reasonable jury to find that the terms and conditions were clear with regard to the oral $3.6 million settlement demands of July and November 2010.

## B. **Westport's Breach Motion**

Westport's Breach Motion requests rulings in its favor that Penn National's duties to defend and indemnify were triggered at the conclusion of the Highport lawsuit and that Penn National breached the insurance contract with IA by failing to fulfill those duties. Westport further seeks a ruling that Penn National's breaches are not excused by any breach of Westport's <u>Stowers</u> duty. Finally, Westport asks the court to find that, even if Westport breached its <u>Stowers</u> duty, Penn National's recovery or offset is limited to the amount it paid toward the judgment.

### 1. **Penn National's Duties to Defend and Indemnify**

The rules for the interpretation of insurance contracts under Texas law are well settled. In construing a written contract, the primary concern of the court is to reveal the contracting parties' intentions as expressed in the instrument. <u>State Farm Lloyds v. Page</u>, 315 S.W.3d 525, 527 (Tex. 2010); <u>Gulf Ins. Co. v. Burns Motors, Inc.</u>, 22 S.W.3d 417, 423 (Tex. 2000). To this end, the

court reads all parts of the contract as a whole and gives effect to each word, clause, and sentence so that no part of the agreement is rendered inoperative.  State Farm Lloyds, 315 S.W.3d at 527. Courts construe terms in contracts to have their plain, ordinary meaning unless something in the contract itself indicates that the parties intended for them to have particular definitions.  See Tanner v. Nationwide Mut. Fire Ins. Co., 289 S.W.3d 828, 831 (Tex. 2009).  When a contract as worded can be given "a certain or definite legal meaning," then it is unambiguous, and the court enforces it as written.  Gulf Ins. Co., 22 S.W.3d at 423.

Westport argues that, as a matter of law, Penn National's duty to indemnify IA was triggered when the trial court issued its final judgment and Penn National's duty to defend IA was triggered when Westport paid $9.9 million in February 2016.  Penn National argues that IA's liability was not final until the court determined the amount of offset due IA for CRC's payment and that, because Westport's payment in excess of its limit was made prior to the June 2016 final judgment, Westport was not relieved of its duty to defend.

Pursuant to the Penn National Policy, coverage liability applied when Westport became obligated to pay its available limits toward the "total sum, after reduction for recoveries or salvages collectible" as determined by final settlement or judgment after an

70

actual trial.[286]  To be final, a judgment must dispose of all issues and parties.  See Cooke v. Cooke, 65 S.W.3d 785, 787 (Tex. App.—Dallas 2001, no pet.)(defining final judgment).  The same can be said of a final settlement.  Therefore, the Penn National Policy was not triggered until the disposition of all issues in the Highport case.[287]

In this case, the total sum Westport was obligated to pay was not determined at the time the trial court entered its final judgment.  Aside from the appeal of that judgment, pending before the trial court was the issue of credit against the trial judgment for CRC's settlement with Highport.  The MOU among IA, Westport, NASIC, and Highport was entered before the trial court resolved that issue.  The MOU provided for the payment only of the undisputed amount of the judgment and specifically reserved the balance of the supersedeas bond until all remaining issues, including the amount offset due IA for the CRC arbitration settlement.  According to the plain language of the Penn National Policy, its coverage liability did not apply until June 6, 2016, when the trial court issued the order determining the balance due in consideration of all credit to IA for the CRC settlement.

---

[286]    Doc. 103-3, Ex. B to Westport's Stowers Mot., Penn National Pol'y p. PENN-000041.

[287]    Westport cites to state law outside of Texas for its assertion that the language of the Penn National Policy did not require exhaustion.  As the court's decision does not hold that it did require exhaustion, the court finds it unnecessary to discuss those cases.

A week after the court entered its order, Penn National paid Highport the remaining balance due after the release of the funds from the court's registry.  Westport makes no argument that a delay of one week between the court's order and Penn National's payment constituted a breach.

Penn National's duty to indemnify was triggered on June 6, 2016.  Westport reimbursed NASIC $1,321,368.35 for the amount released from the court's registry.[288]  Penn National was responsible for the payment of that amount because its duty to indemnify was applicable.  However, Penn National did not pay it at the time and has not reimbursed Westport.  Therefore, Penn National breached its duty to indemnify in June 2016.

Regarding duty to defend, the Penn National Policy stated that the transfer of defense would occur when the underlying limits of insurance were "used up" in the payment of judgments or settlements.[289]  Notably, the policy did not require that the judgment or settlement be final.  Rather, the concern in that provision was that the underlying policy limits be exhausted. Requiring that the judgment be final and all issues resolved would eviscerate the transfer-of-defense provision as the necessity of a

---

[288]    Penn National argues that Westport cannot recover from Penn National because the agreement Westport entered with Highport was without Penn National's consent.  As Penn National did not move for summary judgment on this issue, the court need not address it.

[289]    Doc. 103-3, Ex. B to Westport's Stowers Mot., Penn National Pol'y p. PENN-000041.

72

defense ends with the final judgment.

In this case, the Westport Policy limits were exhausted on February 17, 2016, when it reimbursed NASIC for the payment to Highport in the amount of $9,936,492.65, an amount clearly in excess of Westport's remaining policy limits.  Penn National's duty to defend was triggered at that time.  The following day, Westport notified Penn National that the primary policy was exhausted and that Penn National's duty to defend had been triggered.

Penn National argues that Westport continued to control IA's defense and that Westport never withdrew from the defense, never asked Penn National to assume IA's defense, never sent notice that Westport would no long defend as of a certain date, and never forwarded a bill from the defense counsel to Penn National.  In the insurance contract, Penn National committed to cooperate in the transfer of control of IA's defense.  All of Penn National's complaints regarding what Westport did not do in order to transfer the defense ignore that, according to the summary judgment evidence, Penn National did nothing to assist in the transfer of defense after receiving Westport's notification of exhaustion.

Penn National's duty to defend was triggered on February 17, 2016, and Penn National breached that duty by failing to assume IA's defense.

**2.  Effect of Westport's Potential <u>Stowers</u> Liability**

The question of the effect of Penn National's <u>Stowers</u> claim

73

first requires the court to examine the rights it acquired through equitable subrogation.

Subrogation refers to "the substitution of one party for another such that the new party may assert the rights of the substituted party." Associated Int'l Ins. Co. v. Scottsdale Ins. Co., 862 F.3d 508, 510 (5th Cir. 2017)(applying Texas law); see also Assicurazioni Generali, 228 F.3d at *3 ("Equitable subrogation is the legal fiction through which a person or entity, the subrogee, is substituted . . . to the rights and remedies of another by virtue of having fulfilled an obligation for which the other was responsible."). To prevent double recovery by an insured absent equitable subrogation, insurance companies would be incentivized to delay payment until the insured attempted recovery from a third-party tortfeasor or the tortfeasor would be allowed to escape liability after the insurer paid the claim. See Associated Int'l Ins. Co., 862 F.3d at 510. To avoid "these unfavorable outcomes," an insurer is allowed to "stand in the shoes of the insured" and "assert any claims or rights held by the insured against a third party. Id. (quoting cases)(internal quotation marks omitted).

Under Texas law, an excess insurer "may bring an equitable subrogation action against the primary carrier" to enforce the primary insurer's Stowers duty. Am. Centennial Ins. Co. v. Canal Ins. Co., 843 S.W.2d 480, 483 (Tex. 1992). The Supreme Court of Texas explained:

> The primary carrier should not be relieved of [its
> Stowers] obligation[] simply because the insured has
> separately contracted for excess coverage.  In [that]
> situation, where the insured has little incentive to
> enforce the primary carrier's duties, the excess carrier
> should be permitted to do so through equitable
> subrogation."

Id. (internal citations omitted); see also Royal Ins. Co. of Am. v.
Caliber One Indem. Co., 465 F.3d 614, 620-21 (5th Cir. 2006).  The
burden is on the excess insurer to prove that the primary insurer
violated its duty.  See Assicurazioni Generali, 228 F.3d at *3.  In
any case of subrogation, the excess insurer cannot recover more
from the third party than what it paid.  Associated Int'l Ins. Co.,
862 F.3d at 510.

Westport argues that Penn National cannot rely on the Stowers
doctrine to relieve it of its contractual duties or as a defense to
Westport's breach-of-contract claims.  Both of these
characterizations of Penn National's position are inaccurate.  In
actuality, Penn National's Stowers claim is much more direct.

In June 2016, Penn National paid $379,885.78 to Highport on
IA's behalf to complete the fulfillment of IA's obligation on the
judgment.  By virtue of having fulfilled an obligation for which IA
was responsible, Penn National was substituted to IA's rights under
the Stowers doctrine.  The rights available to IA under Stowers
include the right to impose liability on the negligent insurer for
the amount of a judgment that is excess of the insurer's policy
limits.  No legal authority supports the idea that an excess

insurer must pay the entire amount of a judgment in excess of the primary insurer's policy limits in order to be equitably subrogated to an insured's <u>Stowers</u> claim.  A legal holding of that sort would severely undermine both the <u>Stowers</u> doctrine and the purpose of equitable subrogation.

In this case, Westport paid a large portion of the amount of the judgment that was in excess of its policy limits prior to the triggering of Penn National's duty to indemnify.  Westport seeks indemnification from Penn National for the amount it paid that, but for a successful <u>Stowers</u> claim, fell within the Penn National Policy.  To deny Penn National's subrogated <u>Stowers</u> claim would allow Westport to escape <u>Stowers</u> liability without even being required to provide a defense.  Here, the amount Westport paid was significant, but a rule that the excess insurer always must pay the entire amount over the primary insurer's policy limits in order to bring an insured's <u>Stowers</u> claim would be subject to easy manipulation in every case by the primary insurer attempting to insulate itself from <u>Stowers</u> liability.  The primary insurer would not only avoid liability but would then be entitled to reimbursement from the excess insurer, creating quite the windfall for the alleged tortfeasor.

If the <u>Stowers</u> claim is successful, Westport could be liable for the entire amount of the judgment and would be required to reimburse Penn National.  Obviously, in such a case, Penn National

76

would not be entitled to recover the entire amount Westport in excess of its policy limits as a result of its failing to accept a reasonable <u>Stowers</u> demand because it only paid slightly less than $380,000.  Penn National would be entitled to recover from Westport only that which it paid.  <u>See</u> <u>Associated Int'l Ins. Co.</u>, 862 F.3d at 510.  If the <u>Stowers</u> claim is unsuccessful, Westport would be entitled to recover from Penn National the entire amount of the judgment in excess of Westport's remaining policy limits less the amount paid by Penn National.[290]

## C.  **Penn National's Motion**

Penn National moves for summary judgment on Westport's breach-of-contract and promissory-estoppel claims, asserting that no evidence supports a finding that a valid contract between Westport and Penn National existed or that Penn National made a promise upon which Westport reasonably relied.  Westport argues that a contract was formed through indirect communication whereby Penn National agreed that, if Westport posted the entire bond in the Highport case, Penn National would pay the amount of the judgment in excess of Westport's remaining policy limits.  Alternatively, Westport contends that Penn National promised to honor its policy and pay the excess amount.

---

[290]    In response to Westport's motion, Penn National argues that Westport's payment was voluntary and, therefore, Westport is not entitled to recover from Penn National.  The court need not address this issue as Penn National did not move for summary judgment on that basis.  The court notes, however, that Westport also acquired IA's rights via assignment, which is not subject to the concern whether the payment was voluntary.

### 1. Breach of Contract

A plaintiff must prove the following elements for a successful breach of contract claim under Texas law: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." Mullins v. TestAmerica Inc., 564 F.3d 386, 418 (5th Cir. 2009)(internal quotation marks omitted)(quoting Aguiar v. Segal, 167 S.W.3d 443, 450 (Tex. App.–Houston [14th Dist.] 2005, pet. denied)).

In order to meet the first element, Plaintiff must show: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) a communication that each party consented to the terms of the contract; (5) execution and delivery of the contract with [the] intent [that] it [be] mutual and binding on both parties; and (6) consideration." Coleman v. Reich, 417 S.W.3d 488, 491 (Tex. App.–Houston [14th Dist.] 2013, no pet.). Although "contract formation is a question of fact under Texas law," summary judgment is appropriate if no issues of material fact exist. Delta Brands, Inc. v. Wysong & Miles Co., 203 F.3d 828, 1999 WL 1240802, at *1 (5th Cir. 1999)(unpublished)(citing Crest Ridge Constr. Grp., Inc. v. Newcourt Inc., 78 F.3d 146, 151 (5th Cir. 1996)).

When Westport decided to appeal the jury verdict in the

Highport case, it agreed to post a supersedeas bond in the amount of $3.3 million and asserted that IA or Penn National was responsible for obtaining a bond for the remainder of the judgment. IA and Penn National took the position that the Westport Policy obligated Westport to post a supersedeas bond for the entire amount.  In July 2012 Westport informed IA that it was willing to obtain a bond for the full amount, paying only the proportion of the bond premium that matched the proportion of its remaining limits to the total judgment, if Penn National would pay the remainder of the bond premium and agree to indemnify Westport for the amount in excess of Westport's remaining limits in the event the bond was required to pay the judgment.  In response directly to Westport, Penn National chided Westport, inter alia, for attempting to extract concessions as conditions for honoring the terms of its insurance contract, a statement which Westport understood at the time to mean that Penn National would not enter an agreement with Westport.

In September 2012, IA informed Penn National that Westport would arrange for a bond with itself or an affiliated entity as the principal if, in the event that the judgment was upheld on appeal, Penn National would fund the amount of the judgment in excess of Westport's remaining policy limits without prejudice to Penn National's Stowers claim via equitable subrogation to IA's rights. Penn National responded that it would honor its obligations to IA

79

pursuant to the Penn National Policy and that it had no desire to
enter an agreement with Westport.

In October 2012, IA asked Penn National to confirm that, if
the judgment was affirmed and payment was due prior to the
resolution of Westport's alleged mishandling of the Highport case,
Penn National would honor its insurance policy and pay its portion
of the judgment above the Westport Policy limits subject to the
right to recover from Westport pursuant to equitable subrogation.
Penn National responded that it would honor its obligation to IA
under the Penn National Policy.  In a telephone conversation, IA
asked if Penn National's answer was intended to give the assurance
IA had requested, to which Penn National said that it did.  IA
conveyed to Westport that it had received the requested assurance
that Penn National would fund the judgment amount in excess of the
Westport Policy limits subject to its right to recover against
Westport.[291]

Most of these communications were between IA and Penn
National.  Although Westport made offers, Penn National never
accepted.  Penn National's repeated assurance that it would honor
its policy obligations falls well short of agreeing to all of the
terms of Westport's offer.  Penn National's affirmative response to
IA's vague inquiry whether Penn National intended to give IA the

---

[291]    Although not an issue raised by the parties, IA's motivation in
conveying that Penn National agreed to Westport's terms in order to move Westport
to act is transparent.

assurance it sought does not demonstrate an acceptance in strict compliance with the terms offered.  Nothing in the evidence suggests a meeting of the minds between Penn National and Westport. No written contract, no exchange of emails between Penn National and Westport, or any other communication between Penn National and Westport demonstrates consent by both parties to all terms of the purported contract.[292] Nothing even remotely demonstrates execution and delivery of the contract with the intent that it be mutual and binding on both parties.  In short, the evidence does not even raise a fact issue on the formation of a contract between Penn National and Westport.

Absent evidence of the existence of a valid contract, Westport's breach-of-contract claim cannot survive summary judgment.

**2.  Promissory Estoppel**

As described by the Supreme Court of Texas, promissory estoppel prevents the denial of a promise that "induce[d] substantial action or forbearance by another" when "injustice can be avoided only by enforcement."  Jody James Farms, JV v. Altman Grp., Inc., 547 S.W.3d 624, 636 (Tex. 2018)(explaining that the court's arbitration-estoppel jurisprudence is rooted in the doctrine of promissory estoppel).  To survive summary judgment, the

---

[292]   See Doc. 104-4, Ex. H to Westport's Breach Mot., Oral Dep. of James R. Redeker Dated Oct. 18, 2017 pp. 158-59 (conceding that there was no written contract and no exchange of emails).

nonmovant must produce evidence of: "(1) a promise, (2) foreseeability of reliance, (3) actual, substantial, and reasonable reliance by the promisee to [its] detriment, and (4) that failure to enforce the promise would result in an injustice." Comiskey v. FH Partners, LLC, 373 S.W.3d 620, 635 (Tex. App.—Houston [14th Dist.] 2012, pet. denied)(citing In re Weekley Homes, L.P., 180 S.W.3d 127, 133 (Tex. 2005)).  The alleged promise "must be sufficiently specific and definite that it would be reasonable and justified for the promisee to rely upon it as a commitment to future action." Id.  It cannot be "mere speculation concerning future events, a statement of hope, or an expression of opinion, expectation, or assumption." Id.

The above-discussed evidence fails to support a finding that Penn National made any promise other than possibly a promise to IA that it would honor its policy obligations.  Penn National made no promise to Westport.[293]  More importantly, the evidence fails to allow an inference that Penn National could foresee that Westport would interpret a promise Penn National made to its insured as a promise to Westport to do what Penn National refused to contract to do in the first place.  To the extent that it can be considered a promise at all, it certainly was not sufficiently specific and

---

[293]    Apparently, Westport did not believe that Penn National had made a promise regarding paying its share of the judgment because, in October 2015, Westport implored Penn National to "confirm that it [would] honor its obligation to [IA] and pay its share of the judgment."  Doc. 104-5, Ex. M to Westport's Breach Mot., Letter from Douglas W. Walker to Mark C. Clemer Dated Oct. 26, 2015. p. 1.

82

definite that it would be reasonable and justified for Westport to rely upon in posting a supersedeas bond for more than $11 million when it believed it had no obligation to post a bond for more than $3.3 million.

Absent evidence of the first three elements of promissory estoppel, the claim cannot survive summary judgment.

### IV.   Conclusion

Based on the foregoing, the court **RECOMMENDS** that Westport's Stowers motion be **GRANTED** as to the May 2012 $4.9 million demand **DENIED** as to the May 2009 $2 million demand and the July and November 2010 $3.6 million counteroffers, Westport's contract motion be **GRANTED** as to Penn National's breach of its duty to indemnify in June 2016 and its duty to defend in February 2016 and **DENIED** as to Penn National's duty to indemnify prior to June 2016, and Penn National's motion be **GRANTED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such

objections shall be mailed to opposing parties and to the chambers
of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 31st day of August, 2018.

_____
U.S. MAGISTRATE JUDGE