United States District Court
Southern District of Texas

**ENTERED**

March 20, 2023

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WESTPORT INSURANCE CORPORATION, | § | |
| on its own behalf and as Assignee of | § | |
| HOUSTOUN, WOODWARD, EASON, | § | |
| GENTLE, TOMFORDE, AND ANDERSON, | § | |
| INC. d/b/a INSURANCE ALLIANCE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:16-CV-01947 |
| | § | |
| PENNSYLVANIA NATIONAL MUTUAL | § | |
| CASUALTY INSURANCE COMPANY d/b/a | § | |
| PENN NATIONAL INSURANCE, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before this Court is Defendant Westport Insurance Corporation's ("Westport") Post-trial Brief on Penn National's Unclean Hands. (Doc. No. 225). Plaintiff Pennsylvania National Mutual Casualty Insurance Company d/b/a Penn National Insurance ("Penn National") filed a Brief in Response. (Doc. No. 226). After reviewing the motions, the record, and the applicable law, the Court **DENIES** Westport's Unclean Hands Defense. (Doc. No. 225).

### I. Background

#### A. Factual Background

This case was between two insurers, concerning whether a primary insurer breached its *Stowers* duties owed to an excess insurer. *See G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. 1929). The ultimate outcome of this lawsuit will determine which company has to pay the amount of a final judgment entered against their mutual insured, Houston, Woodward, Eason, Gentle, Tomforde and Anderson, Inc. d/b/a Insurance Alliance ("Insurance Alliance" or "IA") that was in excess of the IA's primary layer of insurance.

1

Magistrate Judge Johnson outlined the factual background of this case in extreme depth in her Memorandum and Recommendation. (Doc. No. 122). The Court does not see the need to repeat that background in depth, but it will briefly summarize the facts of the case for context.

Lake Texoma Highport LLC ("Highport"), an upscale marina located in North Texas on Lake Texoma, entered an agreement with Insurance Alliance. Under their agreement, IA was tasked with finding Highport new insurance policies that fully covered its Marina (the "Highport Marina"). Highport requested certain changes to its current policy, including adding $4 million in coverage for business interruption. IA obtained insurance for Highport Marina, but it was not as comprehensive as that requested by the marina. It did not inform Highport of the discrepancy between what it requested and what IA provided.

Within two months of the effective date of the new coverage period, a storm occurred and the resulting flooding caused extensive damage to the Highport Marina. Unfortunately, the policies IA procured left gaps in Highport's coverage that would have not existed had IA obtained the requested coverage. For that reason, in 2008, Highport filed a lawsuit against IA for its failure to provide the requested coverage.

As it turns out, IA was also insured. It had two policies: (1) a primary policy from Westport and (2) an umbrella policy that provided excess coverage from Penn National. The Westport policy had a $5,000,000 limit of liability per claim while the Penn National umbrella policy carried a $15,000,000 limit. The Westport policy also required Westport to assume Insurance Alliance's defense in cases such as the Highport litigation. When Highport filed suit against IA, Westport was immediately notified and it assumed IA's defense. Penn National, on the other hand, was not notified about the Highport Litigation until 2010, about two years after the Highport litigation began.

2

Throughout the course of the litigation, Highport and Westport engaged in multiple settlement discussions, but the parties never reached an agreement, and the case eventually went to trial in 2012. In the trial, the jury found in favor of Highport. On June 20, 2012, the state trial court entered a final judgment against IA and awarded damages according to the jury's verdict of $8,738,598. IA appealed the verdict.

In order to prevent a seizure of its assets during the appellate process, IA or someone on its behalf needed to obtain a supersedeas bond. Westport discussed the bond with IA, sharing that under their policy, it was only obligated to obtain a bond up to the amount of its remaining policy limits, that was approximately $3.3 million. IA contended that Westport was obligated to procure a bond sufficient to cover the entire judgment. While the two were negotiating, Highport filed a petition for a writ of garnishment to seize IA's assets. This created an immediate need to resolve this issue. In an effort to do that, Westport contacted Penn National, requesting it to bond the portion of the Judgment above Westport's limits. Penn National refused, taking the position that it was Westport's duty to procure the entire bond amount. In order to avoid the seizure of IA's assets, IA as principal and Liberty Mutual Insurance Company as surety obtained a supersedeas bond in the full amount of the judgment to stop execution.

After the emergency subsided, IA wrote both Westport and Penn National, asking them to reimburse it for the bond. Westport said it was "willing to withdraw its argument on the bond, to reimburse IA for the bond premium and substitute itself or one of its affiliated entities as the principal" with the following concession from Penn National: in the event that the judgment is upheld on appeal, Westport and Penn National agree that Westport will pay to Highport the remained of its policy limits and Penn National will fund the rest. (Doc. No. 106-8, Ex. B). With that information, IA went to Penn National to discuss whether it would pay the remainder of the

3

judgment if Westport's policy was exhausted after appeal. Penn National's position was that it "will honor its obligations to [IA] under its insurance policy." (Doc. No. 106-8). It did not, however, commit to make any specific payment.

After receiving Penn National's assurance that it "would honor its obligations," IA as principal and North American Specialty Insurance Company ("NASIC") as surety obtained a substitute supersedeas bond in favor of Highport. The court accepted the bond, and it was filed. Additionally, as planned, Westport agreed to indemnify NASIC.

The Fifth Court of Appeals of Texas sitting in Dallas affirmed the trial court's judgment on November 18, 2014. *See Ins. All. v. Lake Texoma Highport, LLC*, 452 S.W.3d 57 (Tex. App.— Dallas 2014, pet. denied). Eventually, the Supreme Court of Texas denied the petition for review and subsequently denied the rehearing of the petition for review. At that point in time, the case was sent back to the Fifth Court of Appeals, where the court issued a mandate affirming the trial court's judgment on January 20, 2016. The very next day, Highport wrote IA demanding that it pay the full amount or face collection.

Despite the issuance of the mandate, there were still some unresolved legal issues— primarily how earlier settlements by other parties in the Highport-IA lawsuit would be, if at all, credited against the Highport-IA judgment. At this time IA, Westport, and NASIC enter into a Memorandum and Understanding ("MOU") with Highport. Penn National declined to participate in the MOU negotiations. It did not respond to communications from IA. According to the MOU, NASIC was to pay Highport the undisputed amount and pay the remainder of the bond's balance into the court's registry until all remaining issues, including settlement credits due to IA, were resolved. In accordance with the MOU, Westport then reimbursed NASIC for the undisputed amount ($9,336,492.65) on February 17, 2016.

4

Westport subsequently notified Penn National that the primary policy was exhausted, that it was Penn National's duty to pay the "ultimate net loss" in excess of the Westport Policy limits, and that it needed to assume the duty to defend IA. Penn National refused. Westport then took the position that, "given Penn National's repeated refusal to honor its contractual obligations, Westport will continue to protect [IA] and will take whatever steps it deems appropriate and necessary." (Doc. No. 104-6). On June 6, 2016, the trial court determined the balance due to Highport was $1,697,820.48 and released the funds in the court registry as partial satisfaction of the judgment. Westport reimbursed NASIC for the amount released. On June 13, 2016, Penn National paid the remaining amount of the judgment ($379,885.78) to Highport.[1] That resolved the underlying case.

## B. Procedural Background of This Case

Before trial, Westport and Penn National filed competing motions for summary judgment. The Magistrate Court examined the issues presented in the motions, and eventually recommended that this Court grant in part and deny in part Westport's *Stowers* and breach of contract motion and grant Penn National's motion for partial summary judgment on Westport's causes of action for breach of contract and promissory estoppel. The Magistrate Court's reasoning is explained extensively in its 84-page Memorandum and Recommendation. (Doc. No. 122). The Memorandum and Recommendation was later adopted in full by this Court. (Doc. No. 130).

Westport's Motion for Summary Judgment addressed three topics: (1) whether certain settlement demands triggered its *Stowers* duty, (2) whether Penn National breached its duties to defend and indemnify under the Penn National Policy, and (3) whether Penn National's recovery

---

[1] After considering the credit, the trial court determined the balance due to Highport was $1,697,8220.48. NASIC previously submitted $1,321,368.35 in funds to the court's registry. The court released the funds in its registry to Highport in partial satisfaction of that amount, and Westport reimbursed NASIC for the amount released. The remaining amount of the judgment left to be paid was $379,885.78, which Penn National paid.

5

was limited to the amount it actually paid. The Memorandum and Recommendation addressed these topics. The Magistrate Court ultimately held that a May 2010 demand did not, as a matter of law, trigger Westport's *Stowers* Duty; however, the Magistrate Court believed that jury issues existed for the three other settlement demands (May 2009, July 2010, and November 2010).[2] Additionally, the Memorandum and Recommendation determined "Penn National's duty to indemnify was triggered on June 6, 2016." (Doc. No. 122 at 72). Importantly, June 6, 2016, is the date that the trial court issued the order determining the balance due to Highport, resolving the issue of what settlement credit was to be given to IA. The Magistrate Judge also held that Penn National's duty to defend was triggered on February 17, 2016, and that Penn National breached its duty by failing to assume IA's defense. The Order also found that if Penn National were to win on any of its *Stowers* claims, then its recovery would be limited to what it paid ($379,885.78).

After this Court adopted the Memorandum and Recommendation in full, but before trial, Westport filed a Motion for Reconsideration, asking the Court to reconsider the prior ruling that Penn National did not have a duty to indemnify until June 6, 2016. (Doc. No. 184). The Court denied Westport's Motion, agreeing that Penn National's duty to indemnify did not arise until June 6, 2016, when the trial court issued its order determining the balance due in consideration of all settlement credits. (Doc. No. 197 at 8).

The Court subsequently held a pretrial conference. At the pretrial conference both parties agreed to withdraw certain topics from the consideration of the jury, including the issue of unclean hands and Defendant's policy defenses. They agreed that these topics would be decided by the Court post-trial, if necessary. It was agreed that the remaining *Stowers* questions would be presented to a jury. Specifically, the jury was asked to decide whether Westport failed to act as an

---

[2] Westport did not move for summary judgment on the September 2009 settlement demand.

6

ordinarily prudent insurance company when it did not accept Highport-Insurance Alliance lawsuit settlement demands made on May 20, 2009, September 22, 2009, in July 2010, and in November 2010. (Doc. No. 221). After a full trial, the jury concluded that Westport violated its *Stowers* duty on all four occasions. (*See* Doc. No. 221).

After the trial, the parties submitted a joint letter, outlining their view on the remaining issues to be decided. (Doc. No. 223). In that letter, Westport's position was that the remaining issues to be decided by the Court were: (1) whether Penn National acted with unclean hands; (2) if necessary, whether any of Penn National's policy defenses apply; and (3) the parties' claims to recover their respective attorney's fees. (Doc. No. 223 at 1). Penn National, on the other hand took the position that the issue of unclean hands was "moot by virtue of the jury's finding that Westport violated the Stowers Doctrine on two occasions prior to Penn National's notification of a loss." (Doc. No. 223 at 1). Further, Penn National contended that its policy defenses were no longer relevant since the jury found Westport violated its *Stowers* duty on all occasions, and that the only issues to be decided by the Court are: (1) reasonable and necessary attorney's fees for Penn National; (2) prejudgment interest; and (3) the entry of a final judgment. (Doc. No. 223 at 2).

The Court will address the issue of unclean hands.

## C. The Four *Stowers* Events

As mentioned, the jury was asked whether Westport violated its *Stowers* duty by not accepting four Highport-IA lawsuit settlement demands. It found a breach on all four occasions. The Court will briefly discuss the factual background surrounding the settlement demands that were in question.

7

1. May 20, 2009

The first challenged settlement demand was a two-million-dollar demand that was presented at the end of the first mediation on May 20, 2009. In its pretrial motions and during trial, Westport argued to the jury that rejecting this demand did not violate its *Stowers* duty because the Highport lawsuit was in the preliminary stages, very little discover had taken place, IA had not had the opportunity to evaluate the merits of the case, and the time limit for the decision was only forty-five minutes. Despite all these facts, the jury found that a reasonable insurer would have accepted the two-million-dollar May 20, 2009, settlement demand.

2. September 22, 2009

On September 22, 2009, Highport sent IA a *Stowers* demand for $2.2 million. *See* Westport's Tr. Ex. 140. The offer stated that it would remain open for fifteen days. Nevertheless, Westport (on IA's behalf) rejected the demand. Westport argued it was reasonable to reject the demand because Highport had not provided reliable evidence of its damages. The jury, however, concluded that Westport violated its *Stowers* duty by not accepting the September 22, 2009, settlement demand.

3. July 2010

Highport made the third demand in July 2010. In early July, Westport (on IA's behalf) and some of the other defendants proposed a collective $1.8 million settlement to Highport. Under the proposed settlement, IA was to contribute $1.1 million. The offer was conveyed to Highport, without specifying how much each defendant would contribute. Subsequently, Highport presented IA and the other defendants with a counteroffer of $3.6 million. Westport, representing IA, rejected the offer. The jury, again, found that Westport violated its *Stowers* duty by not accepting the $3.6 million July 2010 demand.

4.    November 2010

The last question presented to the jury covered the November 2010 settlement offer. In November 2010, the defendants increased the July 2010 collective offer to $2.1 million. Highport, again, presented a counter demand of $3.6 million. Westport rejected the offer. For the fourth time, the jury determined that Westport violated its *Stowers* duty by not accepting the $3.6 million demand made in November 2010.

## II. Legal Standard

Westport has consistently taken the position that to prevail on a *Stowers* claim one must have "clean hands." Conversely, a party who does not have "clean hands"—an equitable concept— cannot pursue a *Stowers* claim based upon equitable subrogation. The determination of whether a party has unclean hands is left to the discretion of the trial court. *Hand v. State*, 335 S.W.2d 410, 419 (Tex.Civ.App.—Houston 1960, writ ref'd. n.r.e.). The Court, if it finds that Penn National acted with unclean hands, must also determine the effect of that finding.

The unclean hands doctrine relied upon by Westport provides that one who comes into equity must come with "clean hands." *Munzenrieder & Associates, Inc. v. Daigle,* 525 S.W.2d 288, 291 (Tex.Civ.App.—Beaumont 1975, no writ). The idea is that equitable relief is not warranted when a plaintiff has engaged in unjust, unconscionable, or inequitable conduct with regard to the issue in dispute. *In re Francis*, 186 S.W.3d 534, 551 (Tex.2006). In other words, the clean hands doctrine requires that one who seeks equity, does equity. *Id.*

This means that a court sitting in equity may refuse to grant relief to a plaintiff who was guilty of inequitable or unlawful conduct with regard to the issue in dispute. *Grohn v. Marquardt*, 657 S.W.2d 851, 855 (Tex. App.—San Antonio 1983, writ ref'd). Equity does not demand that the parties "have led blameless lives... it does require that they have actually acted fairly and without

9

fraud or deceit as to the controversy in issue." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The doctrine should "not be used as a loose cannon, depriving plaintiff of an equitable remedy ... merely because [it] is guilty of unrelated misconduct. *Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817 (W.D. Tex. 2001) citing *Am. Hosp. Supply Corp. v. Hosp. Prod. Ltd.*, 780 F.2d 589 (7th Cir. 1986). Moreover, a party cannot assert unclean hands if the unlawful or inequitable conduct is "merely collateral to the plaintiff's cause of action." *Grohn,* 657 S.W.2d at 855.

In asserting its *Stowers* claims, Penn National seeks a remedy via equitable subrogation, an equitable remedy. Thus, the unclean hands doctrine may be applicable. *See Simon Cho v. Wells Fargo Bank*, N.A., No. 4:16-CV-256, 2017 WL 3301529, at *6 (E.D. Tex. Aug. 3, 2017) ("equitable subrogation—like all equitable remedies—is sometimes denied to litigants who come to court with unclean hands"). Therefore, the initial question for the Court, therefore, is whether Penn National acted with "unclean hands."

## III. Discussion

In its briefing, Westport contends that "Penn National's wrongful conduct in handling the *Highport* Lawsuit and in breaching its umbrella policy issued to Insurance Alliance was unjust and inequitable and warrants a finding that Penn National acted with unclean hands." (Doc. No. 225 at 2).

Penn National responds, arguing that any issues of unclean hands are "moot by virtue of the jury's finding that Wesport violated the *Stowers* doctrine on two occasions prior to Penn National's notification of a loss (the May 2009 and September 2009 *Stowers* violations), and thus, that any act or omission on the part of Penn National could no bearing on Westport's fault." (Doc. No. 226 at 2). Further Penn National argues, "[o]nce Westport violated *Stowers*, it was solely

10

responsible for all damages resulting from that violation and, even had Penn National acted with

unclean hands following Westport's Stowers violations (which it did not) Penn National's after-

the-fact actions cannot and do not absolve Westport of its liability, which manifested before Penn

National was even aware that a claim existed." (Doc. No. 226 at 2).

The Court will start by addressing the alleged incident of unclean hands. Next, the Court

will discuss the timing of any alleged acts of unclean hands and whether such incidents, because

of their timing or otherwise, are merely collateral to Penn National's causes of action.

**A. Alleged Incidents of Unclean Hands**

Westport alleges many incidents of "unclean hands." Before trial, Westport maintained

that Penn National acted with unclean hands when:

Penn National improperly made the unilateral determination Westport violated the *Stowers* doctrine without any knowledge of what information was in Westport's possession at the time of those demands;

Penn National affirmatively made a unilateral *Stowers* determination and signaled its refusal to further comply with its policy obligations (which it then refused to do when its policy was triggered);

Penn National refused to participate in satisfaction of the final judgment against its insured based on its unilateral determination Westport violated *Stowers*, thus exposing its insured to collection action by Highport;

Penn National refused to respond to numerous communications from its own insured related to its contractual obligations;

Penn National asserted, and maintained for years, an incorrect legal argument that Highport could not collect on the final judgment after the mandate issued because a supersedeas bond was in place;

Penn National asserted, and maintained for years, the incorrect legal position that the payments to Highport were made "voluntarily";

Penn National refused to defend its insured when its policy was triggered.

Penn National refused to indemnify its insured for amounts owed when its policy was triggered.

11

(Doc. No. 210 at 6-7). Westport maintains that Penn National acted with unclean hands, "beginning shortly after it received notice in 2010 and continuing through its breach of its umbrella policy in 2016." (Doc. No. 225 at 3).

In its Post-Trial Brief, Westport contends that that Penn National first acted with unclean hands when "[a]lmost immediately after receiving notice of the Highport Lawsuit, Penn National took the position that it was not going to pay its share of the Highport claim." (Doc. No. 225 at 4). Westport specifically takes issue with an email it received from Boyd Wright ("Wright"), Penn National's corporate representative, in March 2010. In the email, Wright wrote that Penn National would look to Westport to pay any amounts Penn National was ultimately required to pay since Westport had an opportunity to settle within policy limits and did not. Wesport Tr. Ex. 29. At the time Wright wrote that email, and at the time Penn National received notice of the Highport Lawsuit, it had no duty to defend or indemnify. It was not until February 2016 and June 2016, respectively, that Penn National's duty to defend and duty to indemnify arose. (Doc. No. 122 at 72). Accordingly, in 2010, Penn National had no duty to pay or defend. Penn National's later breach of these duties, as found in the Magistrate Judge's Memorandum and Recommendation, and by the Court in its order adopting the Memorandum and Recommendation , does not alter the 2010 landscape. The fact that in 2010 it voiced the opinion that Wesport previously violated its *Stowers* duties does not equate to acting with unclean hands.

Next, Westport argues Penn National acted with unclean hands in 2010, when it "demand[ed] [Westport] resolve [the] case within [its] limits immediately" but simultaneously stated that it could not evaluate the exposure since the damages were nebulous. Wesport Tr. Ex. 144. As Westport maintains, "[t]his type of duplicity—demanding Westport settle while acknowledging internally the lack of available information, especially related to damages—

12

permeates Penn National's handling of the claim. (Doc. No. 226 at 4-5). For the same reasons outlined above, this conduct does not amount to unclean hands. Penn National did not have a duty to defend or indemnify in 2010. It is not *per se* bad faith for an excess carrier to question the amount of overall damages, but at the same time demand that the case be settled before it reaches its coverage. Thus, a request that the primary insurer settle within policy limits, if that option was available, did not equate to unclean hands. If that were the case, nearly all excess insurers would be precluded from recovering under *Stowers*.

Westport also takes issue with Penn National's decision to hire counsel in 2010 to review Westport's file and help evaluate the claim. Westport complains that Penn National instructed counsel "not to aid in the insured (IA's) defense." Westport Tr. Ex. 144. As mentioned, Penn National's duty to defend was not triggered until February 17, 2016—the day the Westport policy limits were exhausted. Penn National's refusal to allow its counsel to aid in IA's defense is not unjust, unconscionable, or inequitable conduct since it had no duty to assist in the defense until its duty to defend arose. *See, Knight v. Volkart*, No. 13–01–00858–CV, 2002 WL 31623580, at *8 (Tex.App.-Corpus Christi Nov.21, 2002, no writ) (holding that conduct that was based on a correct legal position did not constitute unclean hands). Having a lawyer evaluate a case and advise upon coverage is a commonplace happenstance.

Another alleged situation of "unclean hands" focuses on Penn National's promise that it would "honor" its obligations under its contract with IA during the negotiations for the supersedeas bond. First, this representation occurred in October 2012, well after the case, at least according to the jury, could have and should have been settled. One can conclude in 2016, when this Court has found that Penn National breached its agreement with IA on two different occasions that these actions were not consistent with "honoring its obligations." Nevertheless, considering the jury's

13

finding (that Westport breached its *Stowers* duty four times before Penn National's breaches), Penn National was ultimately honored its obligations by paying $379,885.78 of the judgment in June 2016. Therefore, promising to honor its obligations and then only paying $379,885.78, did not harm its insured and did not amount to unclean hands.

Similarly, Westport claims that Penn National acted with unclean hands when it refused to take part in the MOU negotiations. (Doc. No. 225 at 6). The MOU negotiations took place in January 2016. This, again, occurred before Penn National's duty to indemnify or defend arose. For that reason, Penn National did not, at the time, have a duty to take part in the negotiations.

Westport maintains that Penn National acted with unclean hands, "through its breach of its umbrella policy in 2016." (Doc. No. 225 at 3). In essence, Westport argues that Penn National's breach of its duties to defend and indemnify in 2016 support a finding of unclean hands. Under Texas law, however, a party breaching a contract is not sufficient to invoke the doctrine of unclean hands. *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Prop Invs.*, LLC, 481 S.W.3d 336, 351 (Tex. App. 2015); *see David v. Bache Halsey Stuart Shields, Inc.*, 630 S.W.2d 754, 758 (Tex.App.–Houston [1st Dist.] 1982, no writ) (court refused to apply unclean hands doctrine to prevent party who admitted to breaching arbitration provision from seeking temporary injunction); *Spring v. Walthall, Sachse & Pipes, Inc.*, No. 04–05–00228–CV, 2005 WL 2012669, at *2 (Tex.App.–San Antonio Aug. 24, 2005, no pet.) (mem.op.) (rejected the argument that the moving party had unclean hands because of breach of contract and affirmed trial court's order granting temporary injunction). The Court can understand how an insurance company's breach of its duty to defend or indemnify could constitute unclean hands, but because of the timing of events in this case, the Court does not find Penn National's breaches to qualify as actions taken with unclean hands. This issue is discussed further in the following section of the Order.

14

**B. Collateral**

Wesport contends "Penn National's wrongful conduct was directly related to the *Stowers* cause of action it asserted in this lawsuit and the timing of Penn's conduct is not legally relevant." (Doc No. 225 at 2). Not surprisingly, Penn National responds arguing the opposite— "even had Penn National acted with unclean hands following Westport's *Stowers* violations (which it did not), Penn National's after-the-fact actions cannot and do not absolve Westport of its liability, which manifested before Penn National was even aware that a claim existed." (Doc. No. 226 at 2).

As mentioned, the doctrine of unclean hands cannot be used as a defense if the unlawful or inequitable conduct is "merely collateral to the plaintiff's cause of action." *Grohn*, 657 S.W.2d 855. In other words, to invoke the doctrine, "a defendant must show that he was injured by the plaintiff's improper acts." *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796 (5th Cir. 1999). "Where the harm done to the defendant is not serious and can be otherwise corrected, the unclean hands maxim should not be applied." *Id.*

As discussed, the Court does not find the alleged instances of bad conduct to qualify as "unclean hands." Even if they did, however, it is undisputed, and the evidence at trial clearly showed, that Penn National did not receive notice of the Highport Lawsuit until February 2010. (Doc. No. 104-4, Boyd Wright to Jim Berger). Westport goes so far as to conceded that the first alleged incident of unclean hands arose "beginning shortly after it received notice in 2010 and continuing through its breach of its umbrella policy in 2016." (Doc. No. 225 at 3).

The jury found that Westport breached its *Stowers* duty twice before Penn National even had notice of the lawsuit—on May 20, 2009, and September 22, 2009.[3] Therefore, any subsequent

---

[3] While the Court sees the potential validity in Westport's previous contention that the May 20, 2009, settlement demand fails as a matter of law, the jury also found that Westport violated *Stowers* when it rejected a settlement demand made in September 2009 (well before Penn National had notice of the Highport Lawsuit).

15

acts of bad faith or unclean hands as a matter of law are collateral to Penn National's first two *Stowers* claims since Wesport cannot show it or IA was "injured by the plaintiff's improper acts." *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796 (5th Cir. 1999). Once Wesport violated *Stowers*, it was solely responsible for *all damages* that resulted from that breach. In other words, the jury only had to find that Westport violated *Stowers* one single time in order for Westport to be liable for *all the excess damages*. Therefore, any subsequent acts of "unclean hands" are collateral to Penn National's first two *Stowers* claims, and Westport is not entitled to relief.

As briefly discussed, Westport also contends Penn National acted with unclean hands "through its breach of its umbrella policy in 2016." (Doc. No. 255 at 3). Otherwise stated, Westport argues Penn Nation acted with unclean hands when it breached its duties to defend and indemnify in 2016. Penn National responded to this argument in its Supplemental Motion in Limine, contending that the "alleged conduct is collateral to the *Stowers* Claim" because "the *Stowers* demands that are the subject of Penn National's Stowers claim were made... years before Penn National's conduct" that Westport alleged constituted unclean hands. (Doc. No. 205 at 13-14). "In other words, the damage had already been done, by Westport, before Penn National breached its duties." (Doc. No. 205 at 14). Texas courts have explained that the doctrine of unclean hands should "not be used as a loose cannon, depriving plaintiff of an equitable remedy ... merely because [it] is guilty of unrelated misconduct. *Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817 (W.D. Tex. 2001) citing *Am. Hosp. Supply Corp. v. Hosp. Prod. Ltd.*, 780 F.2d 589 (7th Cir. 1986). Penn National's breach of its duty to indemnify and duty to defend (which occurred more than five years after the jury found Westport violated *Stowers*) is "unrelated misconduct" that has no bearing on Westport's *Stowers* violations. Therefore, the Court agrees with Penn National—

16

Penn National's breach of its duties to defend and indemnify, even if such conduct qualified as unclean hands, was merely collateral to Penn Nationals *Stowers* claims.

Considering this, even assuming the above-mentioned acts did constitute "unclean hands," Westport's claims fail because such acts are merely collateral and did not injure Westport.

### IV. Conclusion

For the afore-mentioned reasons, the Court **DENIES** Westport's unclean hands defense. Penn National is **ORDERED** to prepare and file a proposed final judgment with any relevant briefing it chooses to file by April 7, 2023. Westport shall file a response in opposition by April 21, 2023. Penn National may reply, if it does so by April 28, 2023.

Signed at Houston, Texas, this _____ day of March, 2023.

Andrew S. Hanen
United States District Judge

17